# SWINK & COMPANY, INC. *v.* CARROLL McENTEE & McGINLEY, INC.

78-87          584 S.W. 2d 393

### Opinion delivered July 9, 1979
### (In Banc)

*Davidson, Plastiras, Horne, Hollingsworth & Arnold,* Ltd., for appellant.

*Wright, Lindsey & Jennings,* for appellee.

JOHN A. FOGLEMAN, Justice. This litigation arose from dealings in securities in the form of interest-bearing obligations issued by federal agencies in the form of bonds or notes guaranteed by the United States. Carroll McEntee & McGinley, Inc., to which we will refer as McEntee, a corporation with its principal office in New York, is engaged in the purchase and sale of those securities. Swink & Company,

Inc., an Arkansas corporation, to which we will refer as Swink, is licensed as a broker-dealer to engage in the sale of municipal and United States government agency issues. McEntee brought this suit against Swink, alleging breach of contract by Swink in three different transactions. When the case was tried to a jury, a verdict was rendered in favor of Swink on two of the transactions and in favor of McEntee on the other. McEntee did not appeal from the judgment against it, but Swink took this appeal from the judgment against it for $33,391.52.

McEntee alleged that Swink sold $2,500,000 in bonds of the Bank for Cooperatives to it by means of a telephone conversation on October 1, 1975, but failed to deliver the bonds on October 2, 1975, in accordance with the agreement. McEntee asserted that it had sent a written confirmation slip to Swink following the telephone conversation, as customary in the trade. Swink contends that the sale never occurred and that, if it did, McEntee is barred from enforcing it by the statute of frauds applicable in cases of purchase and sale of investment securities. Swink denied that the oral conversation ever took place and further denied that any confirmation of such a transaction was received.

Swink first contends that a verdict should have been directed in its favor, asserting that McEntee failed to produce evidence sufficient to establish an enforceable contract under the applicable statute of frauds. Transactions of this sort are usually initiated over the telephone, but the oral agreements made are reduced to writing. The normal practice is for both the purchaser and the seller to produce a confirmation and transmit it to the other. The applicable statute, Ark. Stat. Ann. § 85-8-319 (Addendum 1961), insofar as relied upon by the parties, reads:

> STATUTE OF FRAUDS. A contract for the sale of securities is not enforceable by way of action or defense unless
>
> (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities

at a defined or stated price; or

\* \* \* \*

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten [10] days after its receipt; or

(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

Swink contends that McEntee failed to show compliance with either (a) or (c). On the other hand, McEntee contends that the evidence shows that the transaction is not barred by this statute of frauds because there was compliance with subsections (a) and (d). McEntee also contends that appellant is estopped from relying on the statute of frauds on the basis of equitable estoppel.

Robert Polk was employed by Swink as its trader in government securities. Herman Jordan was a salesman and branch manager in the Dallas office of McEntee. James Ruffalo was vice-president and treasurer of McEntee, who supervised the accounting operations of the company at its principal office in New York. Thomas Christman was president of McEntee. Ralph Shay was systems manager of Landart Systems, a wholly owned subsidiary of McEntee, which did data processing for McEntee and others in the Wall Street community. His sole responsibility was for the processing of the business of McEntee. Lauren Boykin was head trader at Swink. He bought and sold municipal and government bonds for the firm and supervised others who did so. Katie Woods (formerly Downs) was manager of the operations section of Swink. Jim Swink was chairman and chief executive officer.

In considering the question of sufficiency of the evidence, it must be viewed in the light most favorable to appellee and

all reasonable inferences must be drawn in its favor. *State Farm Mutual Automobile Ins. Co.* v. *Traylor,* 263 Ark. 92, 562 S.W. 2d 595. Only the evidence favorable to appellee is to be considered. *Milburn* v. *State,* 262 Ark. 267, 555 S.W. 2d 946; *Neal* v. *State,* 259 Ark. 27, 531 S.W. 2d 17. Treated in that manner, the evidence was:

Herman Jordan testified: In transactions of the type involved, a firm like McEntee would be called by a firm like Swink by telephone for a bid or offer on a particular security. A salesman in McEntee's office would call its New York office where its traders would state a bid or offer which would be relayed to the inquirer. If a sale to McEntee was proposed, the customer would indicate his acceptance or rejection. If the offer is accepted, the McEntee salesman would then notify the trader in the New York office. In the trade it is considered that there is an oral contract at that time. The market is so volatile, that prices change from minute to minute, so all dealings are conducted by telephone and all contracts are oral. At the time of the acceptance of the offer, the salesman and the representative of the buying firm agree on a settlement date, i.e., the date the securities will be paid for and delivered. Customarily, that is the day following the acceptance. Each dealer has a clearing bank through which the securities are delivered. Worthen Bank in Little Rock was Swink's clearing bank. Worthen uses the Federal Reserve Bank's wire system to notify purchasers of bond deliveries. Prior to the transaction involved here, Jordan had handled 35 to 40 such transactions with Polk, all of which had cleared satisfactorily. Jordan did not recall having dealt with anyone else at Swink. On the afternoon of October 1, 1975, Polk called Jordan and asked for a bid on $2,500,000 in bonds of the Bank for Cooperatives. Jordan obtained a bid from a trader in McEntee's New York office and relayed it to Polk, who accepted and agreed upon a settlement date of October 2, 1975. The bonds were not delivered in New York as agreed, so the New York office of McEntee asked Jordan to check on the transaction. Jordan called Polk, who did not know whether there was a problem, but promised to check. Polk later advised Jordan that Swink was being

failed[1] by Swink's customer. The New York office advised Jordan daily that the bonds had not been delivered, and Jordan continued to call Polk, who continued to say that Swink was being failed. Eventually Polk promised Jordan that he would talk with Swink's customer to see if partial delivery could be made, and the trade cleared up. Polk did advise Jordan that he was trying to get a partial delivery, but it never took place. Polk later advised Jordan that he had entered into an agreement with Ruffalo to settle the matter by a pair-off.[2] Jordan received from McEntee through the mail a written confirmation of the original transaction with Polk on these bonds. McEntee sends written confirmation of all purchases and sales of bonds from the New York office. In the normal course of business, Swink sent written confirmation to McEntee. Jordan had received some from Swink, but did not in every transaction. Polk never denied that the original trade was made as Jordan stated it, in any conversation with Jordan. McEntee's Dallas office never received a confirmation of this transaction from Swink. Jordan had no further involvement in a trade he made unless there was a fail. All of the mechanics of the trade, after the oral contract, are handled in McEntee's New York office.

James Ruffalo testified: an exhibit he identified was a written documentation of the original offer in this trade by Swink, and the purchase by McEntee. This record is the starting point for the computer processing of a trade in McEntee's New York computer. It shows the date, price, settlement date, seller, purchaser and other details of a trade and bears an identifying trade number (this documentation recorded the trade exactly as Jordan had stated it.) In the normal course of business, this document or trade ticket is written by

---

[1] A fail in the business of dealing in these securities in this context is a failure to make delivery according to contract.

[2] By a pair-off, the traders agree upon a resale of the securities by the purchaser in the original transaction to the seller in that transaction, at a current price agreed upon by them. As a result, the non-delivering seller in the original transaction would pay the purchaser in that transaction, only the difference in the price agreed upon in the first transaction and that agreed upon for the resale. No securities are delivered by either party.

McEntee's trader in the New York office as soon as the trade is made. One copy of this trade ticket is sent to Landart Systems for computer processing. McEntee's New York office received a copy of a written confirmation of the transaction from Landart. It included a computation of the amount due Swink on the trade. In the normal course of business, Landart would have sent the copy of the written confirmation to McEntee's New York office on October 1, the day of the transaction. McEntee stood willing, at all times, to pay Swink the amount due on the trade upon delivery of the bonds. Landart furnishes McEntee with a history report, which records all of McEntee's transactions during the preceding month. This report included the trade in question, giving all the pertinent details. Ruffalo became involved in the matter on October 10. After talking with Jordan, he called Polk, who said he knew[3] the transaction and assured Ruffalo that there was no problem with it. During the next week, Ruffalo talked with Polk daily. In the early part of the week, Ruffalo suggested to Polk that partial deliveries be made. On Friday of that week, October 17, no delivery had been made. The following Monday, Ruffalo talked with McEntee's head trader, who was also chairman of its board of directors, and a decision was reached that a pair-off should be negotiated with Swink. Ruffalo made that proposal to Polk, who agreed to it. Ruffalo agreed with Polk to sell the bonds back at a price that was actually lower than the price at which the bonds were being traded. Payment is made in such cases by the purchaser (Swink), advising its bank to remit the difference in the sale prices in the transactions paired off, to the account of the seller (McEntee). A trade ticket was made out by Ruffalo on this transaction. On the designated settlement date, October 22, the remittance had not been received at McEntee's clearing bank. On October 23, Ruffalo called Swink and talked to Katie Woods, who assured him that she knew nothing about the transaction. McEntee had never received any written confirmation of the transaction from Swink. Later that day, Ruffalo arranged to tape record a

---

[3]In the trade, this meant that he was aware of the transaction.

telephone conversation with Polk, in order to have a record that the transaction was known. He had never done this before and McEntee has no special equipment for recording telephone conversations. He used a tape recorder belonging to McEntee's sales manager. The telephone conversation was conducted in the chairman's office on a device used for conference calls. It was a "squawkbox," i.e., a device in which a telephone is placed on a speaker, so that several persons may participate in the conversation with a person on the other end. Ruffalo then called Polk, and recognized the voice of the person who was called to the telephone at Swink's office as Polk's. During the course of the recorded conversation, Polk assured Ruffalo that all three of the persons at Swink who could complete the transaction by approving the wire transfer of money were aware of that transaction. When Ruffalo advised Polk of the conversation with Woods Polk said that she had nothing to do with it and when Ruffalo said that Swink didn't send a confirmation, Polk assured him nothing was awry. Polk assured Ruffalo that he knew both the trade on October 1, and the other trade, and guaranteed Ruffalo that everybody was aware of them. Polk promised to call Ruffalo back. Ruffalo asked Polk to tell one of the three principals at Swink to authorize the transfer that afternoon. McEntee never had a written confirmation from Swink. Ruffalo obtained Boykin's name from Worthen Bank and assumed he was a principal of Swink because he had authority to wire funds on behalf of Swink. Ruffalo called Boykin on October 23, after the telephone conversation had been recorded, but did not reach him until the following day. Boykin said that no transaction had occurred and Ruffalo got McEntee's president into the conversation.

Thomas Christman testified: When Christman learned of the sequence of events, he asked Ruffalo to use extreme precaution because Swink had not sent a confirmation. At Ruffalo's request, he talked to Boykin and Boykin denied knowledge of the transactions. Christman spoke to Boykin about the seriousness of the situation and suggested that Boykin think about the matter and call him back in two hours. In one hour

Swink called Christman and said that there must be some confusion about the matter. Christman related the sequence of events, as he knew them, to Swink. Christman said the amount of the pair-off was $45,000. Swink indicated that it was $35,000, according to confirmations he had. Christman told Swink that he understood that Swink did not have confirmations and Swink replied that he was talking about the difference confirmation. Christman said that McEntee had sent no difference confirmation. Both confirmations would have been needed in order to come up with the figure of approximately $35,000. That was the approximate difference in the two transactions.

Ralph Shay testified: "Month to date" reports are furnished to McEntee daily. They list all trades up to the date the reports are furnished. Landart has a runner who goes back and forth between McEntee and Landart picking up and delivering trade tickets. They are key punched continuously during the day. When a day's trading is completed, the cards are fed into a computer. The resulting "month to date" report is furnished to McEntee the next morning. Confirmation tickets are also produced by the computer on a continuous form. The printout on each confirmation is a four-part form. The individual pieces of paper are separated into four piles. The last two are taken for delivery to McEntee on the following day. The forms are separated according to McEntee's branch office numbers, so all copies that go to one branch can be mailed to that branch. The original confirmation form is taken by one of Landart's operators and stuffed into a window envelope so that the address of the customer shows. The Landart operators run the envelopes through a machine which seals them and puts stamps on them. When the night's work is finished, these envelopes are hand-carried by them to the post office and mailed to the branches and to the customers.

The denial of receipt by Swink was based on Boykin's testimony that he checked the records in the office of Swink and found no confirmation from McEntee and found no record that Swink had issued a confirmation, as is usually

done in the regular course of Swink's business. Polk said that he kept a legal pad on which he wrote purchases he made and a girl would take this record of a purchase to the back office, where a confirmation would be processed. He admitted that he never denied the trade in telephone conversations with representatives of McEntee and did not take the matter seriously until Ruffalo suggested a pair-off. Not until then did he check on the transaction, but he found no confirmation in the back office when he inquired of Katie Woods. Katie Woods testified that she did all the record keeping at Swink. She said that she was responsible for getting the mail and that she had picked up the mail the first five working days in October. She said that she personally opened every letter and reviewed each confirmation. She said that no confirmation of the purchase of these bonds was ever received from McEntee and that Swink had not issued any confirmation of their sale. She said that sometimes the men at Swink failed to make out a confirmation. Jim Swink testified that he also checked the records with Woods' help and found no confirmation of this transaction. He admitted that his concern had received two confirmations from McEntee on smaller transactions, and stated that Swink had settled these two transactions by pair-offs.

Appellee seeks to avoid the statute of frauds through the tape recording of the conversation between Ruffalo and Polk, contending that it constituted compliance with § 85-8-319 (a). Assuming, without deciding, that the tape recording is a writing, as an intentional reduction to tangible form, under Ark. Stat. Ann. § 85-1-201 (46) (Supp. 1977), there is still no compliance with Ark. Stat. Ann. § 85-8-319 (a), because the tape recording was not signed by Swink, the party against whom enforcement is sought, or by any authorized agent of Swink. Appellee also contends that the evidence showed compliance with § 85-8-319 (d). Again, it relies on the tape-recorded conversation with Polk, along with Polk's conversations with Jordan and Ruffalo in which he admitted the transaction and excused performance only on the ground that Swink had been failed by a customer. The mere conversations were out-of-court statements, whether tape recorded or not. They simply cannot constitute an admission or testimony in court, so they are not evidence sufficient to avoid the statute of frauds. Appellee, however, contends that Polk's in-court

testimony that he made such statements takes the case out of the statute of frauds under § 85-8-319 (d). There is considerable question about the sufficiency of these statements as to the details of the transaction, i.e., the quantity of the securities and the defined or stated price. Assuming, however, that they meet this test, Polk was not a party against whom enforcement is sought. It is quite true that he was Swink's agent and that he had considerable authority. Even assuming that he had authority to make admissions against the interest of Swink, however, the admissions must have been made in court in order to be effective under § 85-8-319 (a). Polk certainly did not have any authority to make such admissions at the time he testified. His employment by Swink was terminated in February, 1976. This suit was filed one year later. He certainly was not a "party" or an agent for a party when he testified. *Western Union Telegraph Co.* v. *Scanlon,* 115 Ark. 515, 171 S.W. 916. See also, *Arkansas Anthracite Coal & Land Co.* v. *Dunlap,* 142 Ark. 358, 218 S.W. 839; *Campbell* v. *Hastings, Britton & Co.,* 29 Ark. 512.

This brings us to a much more difficult problem. That is the question of the sufficiency of the evidence to show that written confirmation of the sale by Swink and the purchase by McEntee was received by Swink. Swink denies having received it, so the answer to the question turns upon the sufficiency of the evidence to show receipt. It is well settled that receipt may be shown by circumstantial evidence. *The Travelers Insurance Co.* v. *Thompson,* 193 Ark. 332, 99 S.W. 2d 254.

There is a presumption of fact that, when a letter, properly and sufficiently addressed and stamped, is mailed, it and its contents were received by the addressee in due course of mail, which ceases to exist, and becomes a question of fact, when the addressee denies receipt. *The W. T. Rawleigh Co.* v. *Moore,* 196 Ark. 1148, 121 S.W. 2d 106; *The Travelers Insurance Co.* v. *Thompson,* supra; *Dengler* v. *Dengler,* 196 Ark. 913, 120 S.W. 2d 340; *American Fidelity Fire Ins. Co.* v. *Winfield,* 225 Ark. 139, 279 S.W. 2d 836; *Old Republic Ins. Co.* v. *Martin,* 229 Ark. 1065, 320 S.W. 2d 266; *Click* v. *Sample,* 73 Ark. 194, 83 S.W. 932. A mere denial that a properly mailed letter was not received is not sufficient, as a matter of law, to rebut the presumption; it simply leaves the question of receipt to the

jury. *Southern Engine & Boiler Works* v. *Vaughan,* **98 Ark. 388, 135 S.W. 913.**

The evidence is sufficient to show that the original confirmation was properly addressed. Copies of it were introduced, and all copies were the product of a single operation. The question is whether the testimony of custom and habit was sufficient to show that the address appeared on the envelope, whether it was properly stamped and whether it was placed in the mails. We have previously considered the question of the sufficiency of the evidence of mailing. In *Southern Engine & Boiler Works* v. *Vaughan,* supra, we said:

> ° ° ° The word "mailed," when applied to a letter, means that it was properly prepared for transmission in the due course of mail, and that it was placed in the custody of the officer charged with the duty of forwarding the mail. When, therefore, the witness testified that this letter had been mailed to the plaintiff, it was sufficient evidence that it had been properly directed, stamped and delivered to the officials of the postal department for proper transmission through the mails; and from this the presumption arose that the plaintiff, to whom the same was addressed, received it. This presumption could be rebutted by testimony that it was not in fact received, but the positive denial by plaintiff that same was received would not be sufficient, as a matter of law, to nullify the presumption of its receipt. Such testimony simply left the question as to the receipt of the letter for the determination of the jury, under all the testimony adduced at the trial. * * *

See also, *Burlington Ins. Co.* v. *Threlkeld,* 60 Ark. 539, 31 S.W. 265; *Click* v. *Sample,* supra. On the other hand, we held in *Runyan* v. *Community Fund of Little Rock,* 182 Ark. 441, 31 S.W. 2d 743, that testimony that statements were mailed was not sufficient to show receipt of them or give rise to a presumption in the absence of testimony to show that the envelopes containing them were properly addressed and deposited in the mail.

It is true that the employee who actually mailed the confirmation did not testify, either that the confirmation was ac-

tually mailed, or as to his practice. Some years ago, the Court of Appeals for the Eight Circuit speculated, by way of dictum, that this court might share its view, and that of Professor McCormick, that the mailclerk's testimony would be only cumulative, since, considering the modern volume of corporate correspondence, he could not be expected to remember posting a particular letter or emptying the mail tray on a particular day and probably could only reiterate the executive's description of the office practice. See *Leasing Associates, Inc.* v. *Slaughter & Son, Inc.*, 450 F. 2d 174 (8 Cir., 1971).

Whatever the rule may have been heretofore, Ark. Stat. Ann. § 28-1001, Rule 406 (Supp. 1977) governs the admissibility of evidence on the subject. It provides:

Rule 406. Habit — Routine practice. — (a) Admissibility. Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

(b) Method of Proof. Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.

The testimony of Shay was admissible under that rule. The evidence clearly shows that the confirmation was printed. The routine practice was followed sufficiently that McEntee's Dallas office received its copy. The routine included runing the envelopes containing the confirmations through a machine that insured that the proper postage was placed on the envelope. Swink received at least two confirmations mailed to it through this process. The reliability of Swink's processing of confirmations on receipt must not have been foolproof, because there was a great deal of uncertainty on their part about the receipt of those two. We consider the evidence sufficient to have presented a jury question on delivery and receipt of the confirmation. There was no re-

quirement that the mailing of the confirmation be shown by the person who performed that part of the procedure. *Tabor & Co. v. Gorenz,* 43 Ill. App. 3d 124, 1 Ill. Dec. 868, 356 N.E. 2d 1150 (1976); *Milros-Sans Souci, Inc. v. Dade County,* 296 So. 2d 545 (Fla. App., 1974). See also, *Leasing Associates, Inc. v. Slaughter & Son, Inc.,* supra. In both the Illinois case and the Florida case, evidence similar to that here was held sufficient to show mailing and receipt.

Appellant contends that the trial court erred in giving instructions to the jury. We agree that there were errors in the instructions which require reversal.

The court gave McEntee's requested instruction No. 1. It was a binding instruction, directing the jury to find for McEntee, if it found that there was a contract between the parties, if Swink, acting through its agent, breached the contract and if the breach resulted in damages to McEntee. Swink's attorney objected that the instruction in that form was defective because the issue as to the statute of frauds was omitted. In order to be entitled to recover, McEntee had the burden of proving that the contract between McEntee and Swink fell within one of the provisions of that statute. A binding instruction which ignores a material issue which is an element of the defense to the action is erroneous, prejudicial and incurable: *Davis v. Self,* 220 Ark. 129, 246 S.W. 2d 426; *Miller v. Ballentine,* 242 Ark. 34, 411 S.W. 2d 655.

Appellee contends that the court's denial of appellant's motion for a directed verdict was, in effect, a holding that, as a matter of law, the statute of frauds was not an issue. This argument is totally meritless. The statute of frauds was the principal issue, and the denial of the directed verdict was simply a holding that there was substantial evidence that would, if accepted by the jury, take the contract out of the statute of frauds. Of course, appellee's argument that appellant could not object because it offered no evidence that Arkansas has a statute of frauds is equally meritless.

Appellee also argues that appellant cannot complain because it did not offer a correct instruction. This was not really necessary, because appellant made a proper objection to the binding instruction. In referring to the instruction

offered by appellant, appellee points out that it was erroneous because it would have confused the jury on the issue of existence of a contract because it referred to requirements of law concerning the existence of a contract. It is doubtful that a jury would be misled by the language in appellant's instruction. Appellee is correct in its contention that one of the issues was enforceability of the contract, and not its existence. The language of the statute is couched in terms that make this clear. See also, *Betnar* v. *Rose,* 259 Ark. 820, 536 S.W. 2d 719. The very fact that the evidence clearly shows that, in the business of buying and selling securities, a transaction entered into by telephone is considered as an oral contract, demonstrates the significance of the omission of the issue on the statute of frauds from the binding instruction given. The giving of a later instruction, even if it had been correct, did not cure the omission. *Whaley* v. *Crutchfield,* 226 Ark. 921, 294 S.W. 2d 775.

The instruction upon which appellee relies to cure any error in the binding instruction was itself erroneous. By that instruction, the jury was told that, if it found from a preponderance of the evidence that McEntee caused the mailing of a confirmation slip within an envelope on which there was placed the proper postage, addressed to Swink at its proper address, the law presumes that it was delivered to Swink in due course and the burden was on Swink to show that it was not received. This is not a correct statement of the law, because it gives the presumption of delivery the same effect, regardless of a denial of delivery by Swink. Once the delivery is denied, and it was in this case, the presumption is no longer effective as such and the question of delivery is one of fact, on which the burden remains on the party seeking to establish delivery by circumstantial evidence.

There was also error in the giving of McEntee's requested instruction No. 2. By it, the jury was told that, in the three transactions involved in the case, McEntee had the burden of proving that Polk was acting within the scope of his authority as agent of Swink, and that if it so found, any agreement made by Polk within the scope of his authority would be binding. The question of Polk's authority to sell and purchase the securities involved in the three alleged transactions was not in issue. If the instruction was intended, as appellee now

argues, to be directed to the question whether Polk had the authority to enter into a pair-off, it should not have been directed to the "time of the three transactions involved."

Appellant also objects to the instruction (No. 7) given on the measure of damages. That instruction fixed the measure of damages as the difference between the contract price for the bonds and their fair market value when it became apparent that Swink was not going to deliver the bonds. Appellant says that the true measure is the difference in market value on the day of the trade and the promised date of delivery.

Appellant relies on *Brace* v. *Oil Fields Corp.*, 173 Ark. 1128, 293 S.W. 1041. The question in issue in that case, however, was different from the issue in this case. There, a geologist was employed upon a contract under which he would be given a bonus of $10,000 a year in stock of the corporation by which he was employed, in addition to his monthly salary and expenses. He contended that the measure of damages for the breach of the contract to pay a fixed sum in a particular commodity should prevail and that his measure of damages should be the sum stated. The receiver for the employer contended that the proper measure of damages was the value of the stock at the time of the breach. We held that the employee was entitled to recover the value of the stock at the time of the breach. This was not a transaction in securities such as we have involved here. The time of the breach was clearly fixed in *Brace*. In this case, the situation is somewhat different. Boykin testified that in trades such as are the subject of this litigation, deliveries are occasionally deferred for two or three days after the date agreed upon. The testimony on behalf of McEntee tends to show that there was no renunciation of the contract or refusal to perform until Ruffalo talked with Boykin. In the intervening period, Polk was giving assurances that there was no problem. If McEntee could have known that Swink did not intend to perform, it could have bought bonds in the market on the day of delivery to protect itself. There was no reason for doing so, if there was reason to expect a tardy delivery. Where there is a breach of a contract involving dealings in securities, the usual measure of damages for breach of a contract for delivery of personal property is not always appropriate. See *James Wood General*

*Trading Establishment* v. *Coe,* 191 F.S. 330 (S.D. N.Y., 1961), reversed on other grounds, 297 F. 2d 651 (2 Cir., 1961); *Mekrut* v. *Gould,* 16 Misc. 2d 326, 188 N.Y.S. 2d 6 (1959).

Under the peculiar facts of this case, we cannot say that this instruction was erroneous.

We have not considered appellee's argument on estoppel against appellant's pleading the statute of frauds. Estoppel was not pleaded and it does not appear to have been mentioned during the trial until Swink had moved for a directed verdict. We point out, however, that the facts in this case are unlike those in *White* v. *White,* 254 Ark. 257, 493 S.W. 2d 133, relied on by appellee. In that case, the party who was estopped had, with knowledge of the contract, agreed to its terms and actively participated in activities relating to performance of it. She had also written a letter to one of the contracting parties, referring to the agreement.

The judgment is reversed and the cause remanded.

HICKMAN, J., concurs in the result.

GEORGE ROSE SMITH and BYRD, JJ., dissent as to instruction No. 7.

PURTLE, J., did not participate.