PUBLIC FINANCE COMPANY,
Appellee,

v.

John E. VAN BLARICOME and Debbie
Van Blaricome, Appellants.

No. 67104.

Supreme Court of Iowa.

Sept. 29, 1982.

Edwin F. Kelly and Barry D. Farmer, of Kelly & Morrissey, Fairfield, for appellants.

Michael R. Brown, Fairfield, for appellee.

Considered by REYNOLDSON, C.J., and LeGRAND, UHLENHOPP, McGIVERIN and CARTER, JJ.

UHLENHOPP, Justice.

The main question before us in this appeal of a law action tried to the court is whether proof of mailing must be established by testimony of the person who deposited the item in a United States post office box or may be established by testimony as to office custom.

In May 1978 plaintiff Public Finance Company extended credit of $4200 to defendant John and Debbie Van Blaricome under the terms of an installment note and security agreement, with a 1973 automobile as collateral. The Van Blaricomes were to make twenty-four monthly payments of $175 each on the loan, and evidently did make some payments in 1978 and 1979. The monthly payments to Public Finance had stopped, however, by August of 1979. In December 1979, Public Finance filed suit against the Van Blaricomes claiming that they had defaulted on their obligation. The Van Blaricomes filed an answer admitting that they executed the note and security agreement but denying the service of a notice of default and right to cure.

At trial, copies of default notices, alleged by Public Finance to have been mailed to the Van Blaricomes, were introduced into evidence by Public Finance over the Van Blaricomes' objection. The Van Blaricomes claimed no proper foundation for the admission or proof of mailing had been made. Steve Kvale, credit manager of Public Fi-

nance, testified that he personally prepared the notices of default and placed them in the company's outgoing mailbox, and he explained the office custom of mailing items from the mailbox. He could not personally testify, however, that someone actually placed that outgoing mail in a United States post office. The trial court found the Van Blaricomes liable on the installment note. The Van Blaricomes ask us to hold the trial court erred in admitting the copies of default notices into evidence and in granting judgment against them on the petition.

The Van Blaricomes also appeal the trial court's dismissal of their counterclaim alleging Public Finance violated provisions of the Iowa Debt Collection Practices Act, Iowa Code §§ 537.7101–.7103 (1979). Relatives of both John and Debbie Van Blaricome testified that Steve Kvale had telephoned them in order to locate the Van Blaricomes, and referred to their debt. The trial court held, however, that the Van Blaricomes failed to prove by a preponderance of the evidence that Public Finance, through its agent Kvale, intentionally violated the Iowa Debt Collection Practices Act.

■ Our review is on error. The trial court's fact findings have the effect of a special verdict; if supported by substantial evidence they are binding on us. *State v. Hall,* 287 N.W.2d 564, 565 (Iowa 1980); *Herman Ford-Mercury v. Betts,* 251 N.W.2d 492, 493 (Iowa 1977). We can interfere with the trial court's determination of evidentiary insufficiency against the party having the burden of proof only if the evidence is so overwhelming that the party carried the burden as a matter of law. *First National Bank of Lennox v. Claiser,* 308 N.W.2d 1, 3 (Iowa 1981).

I. *Custom as sufficient proof of mailing.* The Van Blaricomes objected at trial to the admission of copies of default notices. Public Finance claims to have sent notices to the Van Blaricomes; the Van Blaricomes, however, deny receipt.

■ The importance of giving notice is found in section 537.5110 of the Iowa Code, which provides:

1. Notwithstanding any term or agreement to the contrary, the obligation of a consumer in a consumer credit transaction is enforceable by a creditor only after compliance with this section.

2. A creditor who believes in good faith that a consumer is in default may give the consumer written notice of the alleged default, and, if the consumer has a right to cure the default, shall give the consumer the notice of right to cure provided in Section 537.5111 before exercising any right he may have to enforce.

Notice of default and right to cure must be given before a creditor is entitled to bring suit on the obligation. *Farmers Trust & Savings Bank v. Manning,* 311 N.W.2d 285, 290 (Iowa 1981); *First Northwestern National Bank v. Crouch,* 287 N.W.2d 151, 154 (Iowa 1980).

The creditor has the burden of proving that notice was given. *Farmers Trust and Savings Bank,* 311 N.W.2d at 290. A creditor gives notice to the consumer "when he delivers the notice to the consumer or mails the notice to him at his residence. . . ." Iowa Code § 537.1201(4) (1979). The Van Blaricome's complaint is that Public Finance failed to meet its burden of proof in establishing that a notice of default and right to cure was in fact mailed.

■ The Van Blaricomes point to Iowa cases setting out the requirements for proof of mailing. The court set out a six-pronged test for meeting the burden of proof in *Central Trust Co. v. City of Des Moines,* 205 Iowa 742, 218 N.W. 580 (1928). Evidence must be introduced:

1) Of the contents and execution of the paper;

2) That it was enclosed in a wrapper or otherwise prepared for transmission through the mail;

3) Of the correct address of the person to receive it;

4) That the wrapper was properly addressed;

5) That postage was prepaid, and

6) That the article was deposited in the mail.

*Id.* at 746, 218 N.W. at 582. *See also Reserve Insurance Co.,* 260 Iowa at 744, 150 N.W. at 635; *Forrest v. Sovereign Camp Woodmen of the World,* 220 Iowa 478, 480–81, 261 N.W. 802, 804 (1935).

In their brief, the Van Blaricomes challenge the sufficiency of proof as to the fourth (address), fifth (postage), and sixth (mailing) prongs of the test. At trial, their attorney unsuccessfully objected to the admission of the notices of default on the basis that "no proper foundation has been laid for their admission, nor testimony as to their actual physical mailing . . . ." At the close of their case, defense counsel moved for dismissal stating "again our objection is to the notice of the right to cure."

█ When a party seeks to exclude evidence, the specific grounds of objection must be indicated to the trial court. This is to alert the court to the question raised and to enable opposing counsel to take proper corrective measures to remedy the alleged defect. *State v. Pardock,* 215 N.W.2d 344, 348 (Iowa 1974). This court has held that where the objection to evidence is based on a claim of "no proper foundation" but does not state in what respect the foundation is lacking, the objection is insufficient to provide a basis for review on appeal. *Thompson v. Bohlken,* 312 N.W.2d 501, 509 (Iowa 1981); *Shinrone, Inc. v. Tasco, Inc.,* 283 N.W.2d 280, 288 (Iowa 1979).

█ In the case before us, the Van Blaricomes waived their right to challenge the sufficiency of evidence as to proper postage and addresses; those objections were not specifically raised at trial. They did, however, preserve error as to the question of actual mailing.

The real point of contention is whether notices to the Van Blaricomes were actually deposited in the United States mail. This court has found the proof insufficient where the only evidence was that a supervisor had signed the letter in question, but was without personal knowledge of whether the letter had ever been deposited in the mail. *Forrest v. Sovereign Camp Woodmen of the World,* 220 Iowa 478, 261 N.W. 802 (1935). Testimony as to a secretary's regular office routine after letters were signed, which included depositing them in the mail, was held insufficient to prove mailing. *Id.* at 481, 261 N.W. at 804. The Eighth Circuit Court of Appeals also refused to admit evidence in a situation somewhat similar to *Forrest.* *Leasing Associates, Inc. v. Slaughter & Sons, Inc.,* 450 F.2d 174 (8th Cir. 1971). In *Leasing* a supervisor testified that after signing a letter he had dictated to his secretary, he put it in his out box for the mail clerk to pick up and mail. Absent testimony from the mail clerk to verify either that he mailed the particular letter or that it was his custom to do so, the court refused to indulge in a presumption of mailing. *Id.* at 179.

Some state courts adhere to this view—allowing mailing to be proved by evidence of an office custom, only if corroborated by evidence showing the custom was followed in the particular instance. *Employers National Insurance Co. v. Parker,* 286 Ala. 42, 236 So.2d 699 (1970); *Commonwealth Edison Co. v. Property Tax Appeal Bd.,* 67 Ill.App.3d 428, 23 Ill.Dec. 710, 384 N.E.2d 504 (1979); *Harris v. Georgia-Pacific Corp.,* 395 So.2d 856 (La.App.1981); *Nafstad v. Merchant,* 303 Minn. 569, 228 N.W.2d 548 (1975); *Matsko v. Dally,* 49 Wash.2d 370, 301 P.2d 1074 (1956).

McCormick notes that some courts, possibly a majority, require the employee who did the actual mailing to testify the item in question was mailed. *McCormick on Evidence* (2d Ed.) § 195 at 464 n.18. He states however:

It is usually held that when a letter has been written and signed in the course of business and placed in the regular place for mailing, evidence of the custom of the establishment as to the mailing of such letters is receivable as evidence that it was duly mailed.

*Id.*

Several federal and state courts apply the latter view. In a federal case a bank offi-

cer testified he dictated a letter and signed it after his secretary had typed it. He also testified that his secretary's practice was to send out all dictated letters by mail. Further testimony showed the letter had been placed in an envelope and put it in an outbox for mailing and that mail boys customarily picked up mail in the office outbox, ran it through a postage meter, bagged it, and placed it in the neighborhood post office. The court held mailing could properly be proved by this office custom without testimony from the person who personally placed the letter in the post office. *United States v. Joyce,* 499 F.2d 9 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). In another case a manager described the office practice for mailing credit cards. The court found this to be sufficient evidence of mailing, and thought that to require further testimony by employees charged with subsequent ministerial tasks in the mailing process would be cumulative. The court also recognized that those employees could not be expected to recall processing specific cards. *United States v. Matzker,* 473 F.2d 408, 411 (8th Cir. 1973). Their testimony merely would have affirmed the manager's description of office procedure and statement that it was invariably followed. *Id.* at 411. Other federal decisions holding evidence of business custom sufficient proof of mailing include *United States v. Vandersee,* 279 F.2d 176 (3rd Cir. 1960); *Citizens Bank & Trust Co. of Middlesboro, Ky. v. Allen,* 43 F.2d 549 (4th Cir. 1930); and *Myers v. Moore-Kile Co.,* 279 F. 233 (5th Cir. 1922).

Several state courts also have adopted this rationale. The Florida Supreme Court recognized that requiring evidence as to the actual mailing of the particular letter would be unreasonable. The court adopted a presumption that, absent proof to the contrary, a showing of a general office practice would lead to the conclusion of mailing in a particular instance. *Brown v. Giffen Industries, Inc.,* 281 So.2d 897, 900 (Fla.1973). In another case an insurance company refused to pay a claim alleging the policy had been cancelled; the insured party, however, denied receipt of any cancella-

tion notice. The company's procedure for sending cancellation notices was explained at trial by a supervisor who oversaw this procedure. No evidence was presented by employees who performed the detailed mailing functions as to whether they complied with office mailing procedures on the days in question. In holding the testimony sufficient to constitute proof of mailing the court noted:

> [A] significant minority has adopted the view that evidence of business custom or usage is sufficient to establish the fact of mailing without further testimony by an employee of compliance with that custom. The rationale is that to require employees to testify that they complied with the ordinary business practice would be merely cumulative, considering the modern volume of corporate correspondence. Mail clerks or other employees could hardly be expected to remember posting a particular letter or emptying a mail tray on a particular day and most likely could only reiterate the executive's description of the office practice.

*Good v. Detroit Automobile Inter-Insurance Exchange,* 67 Mich.App. 270, 275, 241 N.W.2d 71, 74 (1976).

A number of other state courts have held testimony of office custom to constitute sufficient proof of mailing, even absent evidence that the custom was followed on a particular occasion. *Consolidated Motors, Inc. v. Skousen,* 56 Ariz. 481, 486, 109 P.2d 41, 43, *cert. denied,* 314 U.S. 631, 62 S.Ct. 64, 86 L.Ed. 507 (1941); *Swink & Co., Inc. v. Carroll McEntee & McGinley,* 266 Ark. 279, 291, 584 S.W.2d 393, 400 (1979); *Lucas v. Hesperia Golf & Country Club,* 255 Cal. App.2d 241, 247, 63 Cal.Rptr. 189, 193 (1967); *Canyon Crest Villas South v. Board of County Commissioners,* 36 Colo.App. 409, 411, 542 P.2d 395, 396 (1975); *Milros-Sans Souci, Inc. v. Dade County,* 296 So.2d 545, 547 (Fla.Dist.Ct.App.1974); *J.I. Case Co. v. Sinning Bros. Motor Co.,* 137 Kan. 581, 583, 21 P.2d 328, 330 (1933); *Pence Mortgage Co. v. Stokes,* 559 S.W.2d 500, 507 (Ky.Ct. App.1977); *Mohr v. Universal C.I.T. Credit Corp.,* 216 Md. 197, 203–04, 140 A.2d 49, 52

(1958); *Meehan v. North Adams Savings Bank,* 302 Mass. 357, 363, 19 N.E.2d 299, 302 (1939); *First National Bank of Independence v. Mid-Century Insurance Co.,* 559 S.W.2d 50, 52 (Mo.Ct.App.1977); *Crissey v. State Highway Comm.,* 147 Mont. 374, 379, 413 P.2d 308, 312 (1966); *Start v. Shell Oil Co.,* 202 Or. 99, 126, 273 P.2d 225, 230 (1954); *Campbell v. Royal Indemnity Co. of New York,* 256 Pa.Super. 312, 318, 389 A.2d 1139, 1144 (1978); *Christie v. Open Pantry Marts, Inc. of Delaware Valley,* 237 Pa.Super. 243, 246, 352 A.2d 165, 167 (1975); *Southern Region Industrial Realty, Inc. v. Chattanooga Warehouse & Cold Storage Co., Inc.,* 612 S.W.2d 162, 164 (Tenn.Ct.App. 1980); *Smith v. F.W. Heitman Co.,* 44 Tex. Civ.App. 358, 362–63, 98 S.W. 1074, 1077 (1907); *Whitney Wagon Works v. Moore,* 61 Vt. 230, 239, 17 A. 1007, 1010 (1889).

In the case before us, the credit manager of Public Finance, Steve Kvale, testified he personally put default notices to the Van Blaricomes in the office outgoing mail box. He also testified that standard office procedure was for his cashier to pick up all mail in the outgoing box and drop it in the local post office box just prior to five o'clock each evening. Testimony from other employees as to the same office procedures would have been repetitive. The cashier would not likely recall that she deposited the mail in the post office on a particular day a year or so previously. She could only say that was her custom—which the supervisor has already testified. We therefore hold Kvale's testimony of office custom to be sufficient, absent proof to the contrary, to raise a presumption that the notices of default were mailed. The trial court correctly received copies of these notices into evidence. We approve the trial court's finding for Public Finance on its claim of default by the Van Blaricomes.

II. *Debt Collection Practices Act.* Section 537.7102 of the Iowa Code defines a "debt collector" as one who collects a debt for himself or his employer. Steve Kvale was subject to the provisions of the Debt Collection Practices Act. Section 537.-7103(3) of the Code provides in part:

A debt collector shall not disseminate information relating to a debt or debtor as follows:

a. The communication or threat to communicate or imply the fact of a debt to a person other than the debtor or a person who might be reasonably expected to be liable for the debt, except with the written permission of the debtor given after default.

A. The record indicates that Kvale communicated the fact of the Van Blaricomes' debt to their relatives. Donna Van Blaricome, John's mother, testified that a man identifying himself as Steve from Public Finance Company called her on several occasions in an attempt to locate her son John. Portions of her testimony are as follows:

Q. Did the individual identify himself as Steve, advise you that John had a debt with Public Finance Company? A. Yes.

Q. Did he advise you of this on more than one occasion? A. Yes, he did.

Q. Did the individual of the name of Steve, advise you that he was going to take action against John to collect the debt? A. The last call he made to me was that he was going to take action, and I didn't get ahold of John. I was laid up with my leg. I couldn't get out.

. . . .

Q. Okay. Did the person calling convey to you that he was going to send the sheriff? A. Yes, he did.

Q. Could you be mistaken about that? A. Absolutely not, on a couple of occasions.

Q. At least two occasions? A. The last was he said if he didn't call by 5 o'clock, the sheriff will be down.

Q. Were you frightened? A. Well, I can't let things worry me about things like that because of my health. I wasn't really frightened about it.

Q. Did you advise him that John was not at your house when he was calling you? A. Yes, I told him he didn't live there.

Q. Did he still want to give you information or continue talking about this

debt? A. Continued talking to me, made several remarks and I said "Well, I have tried to raise my kids to pay their bills. I always pay my bills and such as that," and I made a reference to it and I said "I can't help it. Anyway, I can't pay his bills for him."

Q. Did he ask you to pay his bills? A. No, he didn't ask me to.

. . . .

Q. Were you liable for this debt of John or Debra? A. No.

. . . .

Q. Who is the first person that told you that John had a debt to them? A. Steve on the phone.

Q. Speak up. A. The man was on the phone. Steve from Public Finance Company and said he was wanting payment, so I figured that they had a debt.

Q. And did they identify themselves as being from Public Finance Company at the time they called? A. Yes.

Q. And you say it was a number of calls? A. Oh, yes.

Q. Could you be mistaken about that? Could he have said only "This is Steve" and left a number and not said anything else about the debt? A. The first several times, yes, but after that he didn't.

Q. He kept calling? A. Kept calling.

Doris Barber, Debbie Van Blaricome's mother, also testified that the fact of the Van Blaricomes' debt was communicated to her. She testified:

Q. What was the circumstances of that call? A. He said he was from Public Finance and his name was Steve. I can't tell you the last name, because I can't remember that but that he wanted to get ahold of Deb; that they owed money, and that he wanted her to call back before 5 o'clock; and the later ones was that he was going to take action, if she didn't call back by 5.

Q. Did he ever state anything as to why he was calling? A. That they owed back payments on a loan.

Q. There's been testimony in this case, that the witness only called, gave his name and left his phone number. A. He told me he was from Public Finance and his name was Steve, and he did leave a phone number. I told him I worked part of the time and I would have to leave a message at home, and I would try to get ahold of her at where she was working and that was about the best I could do.

Q. Are you certain that you are not mistaken about the fact that he informed you there was a debt? A. No, I am not.

. . . .

Q. Did the person volunteer the information about the debt of John and Debbie? A. Yes, he did.

Gary Barber, Debbie Van Blaricome's brother, testified he received a telephone call from Kvale while answering the telephone at his mother's home. His testimony was as follows:

Q. Have you ever received a phone call regarding a debt of either John or Debbie Van Blaricome? A. Yes, I have.

Q. Will you relate those facts to the judge? A. I was at my mother's house when I, early in the afternoon and I got a call and it was explained he was Public Finance and he wanted to talk to either John or my sister, Deb, about the loan they had had, and that, and I told him I'd give him the message.

Q. Did he volunteer or give you any message indicating that there was a debt of John or Debbie to Public Finance? A. Yeah, it was about the car they had had.

Q. And could you be mistaken about that fact? A. No, because he talked plainly enough and it was kind of loud enough.

. . . .

Q. You say the content of the message, do you know exactly what he said? A. Not exactly. It was about the loan that Deb and John had. About more or less had to do with the car they had gotten thru—

Q. Did you know anything about this loan that they had thru Public Finance in discussions with your sister? A. No.

Q. You don't know exactly what the content of that message was? A. Just what I have said.

Q. It concerned a debt, a loan or a car? A. He specified about the loan they had with them.

Kvale's own statements corroborate the testimony of these witnesses:

Q. Mr. Kvale, did you ever have any written permission from either of the two defendants, to communicate or imply the fact that a debt was against them and the right to communicate to their parents? A. Nothing written.

. . . .

Q. Mr. Kvale, you heard some testimony from approximately four people here indicating that when you make a phone call, you identify yourself from Public Finance and informed them that a debt was owed. Is it your policy normally to do that? A. No, it isn't.

Q. To the best of your recollection, do you recall ever identifying yourself as from Public Finance when you made any calls to the parents or to the homes of the parents of either of the two defendants? A. All I recall is identifying myself by my first name and at best, information given would have been in regards to an automobile, as to the best of my recollection.

. . . .

Q. You also gave information that John and Debbie owed your firm money, didn't you? A. If it were implied because I was talking about a vehicle—only if it were implied or taken in that manner.

. . . .

Q. Did you ever threaten that you were going to sue them for the debt? A. As far as outright suing, I said take legal action.

Q. But the only thing you said is "We're going to take legal action for the debt, if they didn't call." A. Legal, yes.

. . . .

Q. But it would continue to be your testimony that in connection with your telephone calls with Donna Van Blaricome and Doris Barber, that on those calls, you did nothing more than saying you were starting legal action to collect that debt, if they did not pay it? A. To the best of my knowledge, that's what I am saying.

Q. Did you make notations of each telephone call that you made? A. I made notations of dates, calls and either message or number left. On one occasion I do have somewhere on one of those sheets where I had left a message to the extent that we may take a legal route.

Q. But isn't it correct that you don't make a complete written record of every phone call that you make? A. As a word for word itemization of what transpired in a call, no, but most commonly the date of a contact is notated.

Q. Isn't it correct that your company advises you that you are not to communicate the fact of a debt because of the fact that these are consumer credit loans and it's a violation of the consumer credit law? A. Yes.

Q. And you're not supposed to even communicate to other persons that you're thinking of legal action, are you? A. No.

Q. But you did do that, didn't you? A. I mentioned a legal alternative, yes.

Q. You did that to both Mrs. Barber and Mrs. Van Blaricome? A. I am positive to Mrs. Barber is Debbie's mother, yes. I left that statement with Mrs. Barber.

Q. And you also made a similar statement to Mrs. Van Blaricome, didn't you? A. I am not, I am not familiar with telling her anything about a legal alternative. I don't recall.

Q. But she has testified under oath regarding that. You wouldn't dispute that, will you? A. If she remembers something that I don't.

Q. It could be true? A. It could be true.

Q. And you knew that neither of these people you were communicating the facts of this debt with, were liable for the debt, didn't you? A. Yes.

Q. And you also knew that you did not have written permission of either John or Debbie to communicate with them, didn't you? A. I had a verbal from Debbie once.

Q. I asked— A. Nothing written.

Kvale's testimony makes reference to ledger cards that were kept for each consumer loan. Those cards, which were admitted into evidence, bear the following notations:

3/28 Called his mom again, asked her to get his msg that if doesn't call 2day that plan on repo on 3/29.

11/19 pho his mom noon 11/20 to respond or full suit she give msg this pm.

10/17 pho her mom L msg & # either SCO by 5 pm or next contact be through court.

B. The testimony and exhibits demonstrate prohibited practices under the Iowa Debt Collection Practices Act. The Act, however, contains exceptions. First, a communication is permissible if made to "a person who might reasonably be expected to be liable for the debt," Iowa Code § 537.7103(3)(a) (1979), but the testimony of Kvale indicates he knew the Van Blaricomes' relatives were not liable for this debt.

A second exception allows communication if the debt collector has written permission to contact others, given by the debtor, after default. Iowa Code § 537.7103(3)(a) (1979). Some evidence appears that John Van Blaricome gave Kvale the Van Blaricome and Barber telephone numbers, but the evidence does not show this was for the purpose of allowing Kvale to communicate the fact of the debt to relatives. Rather, it was to aid Kvale in locating the debtors. In addition, the statute provides such authorization must be written. Iowa Code § 537.7103(3)(a) (1979). Kvale testified he did not receive written permission.

A third exception permits a debt collector to contact third persons in order to locate the debtor. Section 537.7103(3)(a) of the Iowa Code provides in part:

[T]his paragraph does not prohibit a debt collector from any of the following:

. . . .

(4) Attempting to locate a debtor whom the debt collector has reasonable grounds to believe has moved from his residence where the purpose of the communication is to trace the debtor, and the content of the communication is restricted to requesting information on the debtor's location.

Locating the Van Blaricomes was the initial reason for Kvale's contacting members of their families, but Kvale exceeded the statutory limits when he talked about their debt.

Section 537.5203(3) of the Code provides that a creditor may not be held liable for a violation if he shows by a preponderance of the evidence that it was unintentional. Kvale admitted his company had advised him that communicating the fact of a debt or legal action to other persons would be a violation of the consumer credit laws. He did so anyway. The provisions on unintentional violations is inapplicable.

■ We hold on the record that John and Debbie Van Blaricome established as a matter of law that Kvale violated section 537.7103(3)(a) of the Code by communicating the fact of the Van Blaricomes' debt to third persons. Kvale's acts do not fall within prescribed exceptions.

C. The General Assembly adopted the Iowa Debt Collection Practices Act as part of the larger Consumer Credit Code. 1974 Iowa Acts ch. 1250. A death of Iowa law exists interpreting its provisions. Congress passed a Fair Debt Collection Practices Act in 1977 which is similar to the Iowa act.

Section 537.7103(3)(a) of the Iowa Code, prohibiting communication of a debt to a third person, has a counterpart in section 1692c(b) of title 15, United States Code (1976). Legislative history of the federal act indicates the underlying purpose of this provision is to protect the consumer's right of privacy by prohibiting the disclosure of his personal affairs to friends, neighbors, or employees. 1977 *U.S. Code Cong. & Ad. News* 1695, 1696. The Federal Trade Commission has enforced this provision by ordering creditors to desist from communicating to third persons the fact of a debt. *See In re Hallcraft Jewelers, Inc.,* 89 F.T.C. 415 (1977) (creditor threatened to inform military-personnel debtor's superior officers of outstanding debts); *In re National Account Systems, Inc.,* 89 F.T.C. 282 (1977) (creditor urged employers to pressure employee-debtors to pay their debts). *See also State v. O'Neill Investigations, Inc.,* 609 P.2d 520 (Alaska 1980) (contacting employers of debtor for assistance in collecting debts held to be unfair practice).

The trial court mentioned that the Van Blaricomes failed to prove any actual damages resulting from Kvale's prohibited debt collection practices. Regardless of actual damages, an action against Public Finance is a permissible course for the Van Blaricomes to take. Section 537.5201(1) of the Code provides:

> The consumer has a cause of action to recover actual damages and in addition a right in an action other than a class action to recover from the person violating this chapter a penalty in an amount determined by the court not less than one hundred dollars nor more than one thousand dollars if a person has violated the provisions of this chapter relating to:
>
> . . . .
>
> y. Prohibitions against unfair debt collection practices under section 537.-7103.

This court has previously held that when a consumer proves violations of the Iowa Consumer Credit Code and is thereby entitled to bring a civil action under section 537.5201(1) of the Code, the consumer is entitled to have the trial court assess the statutory penalty even though the consumer fails to prove actual damages. *First Northwestern National Bank v. Crouch,* 287 N.W.2d 151, 154 (Iowa 1980) (creditor had violated section 537.5110 by failing to give notice of right to cure).

In addition we look to federal courts' interpretations of the analogous Federal Fair Debt Collection Practices Act, section 1692, 15 United States Code (1976). Section 1692k(a) of that act provides for civil damages in the amount of:

> 1. any actual damage sustained by such person as a result of such failure;
>
> 2. (A) in the case of any action by an individual such additional damages as the court may allow, but not exceeding $1000.

A consumer successfully proved violations of the federal act in *Harvey v. United Adjusters,* 509 F.Supp. 1218 (D.Or.1981). The court awarded the consumer statutory damages under section 1692k(a)(2)(A) even though no actual damages were shown under section 1692k(a)(1). The court stated:

> The provisions of the Act are designed to prevent unscrupulous debt collection practices, most of which would cause mental anguish or emotional injury rather than pecuniary loss. To require that pecuniary damages be suffered as a prerequisite to an award of statutory damages would reduce the effectiveness of the Act.

*Harvey,* 509 F.Supp. at 1222.

We adopt the rationale of the *Harvey* court and reaffirm the *Crouch* holding that consumers may bring civil actions under section 537.5201(1) of the Code even though they may have suffered no actual damage. By use of the word "penalty" the legislature has placed emphasis on the abusive actions of the debt collector that must be checked if the purpose of the statute is to be effectuated. To allow Public Finance to escape liability in this instance would be

tantamount to ignoring the provisions of the Iowa Debt Collection Practices Act in the face of violation of its provisions. *See* Note, *A Choice of Remedies for the Credit Consumer—The Federal "Fair Debt Collection Practices Act" and the "Iowa Debt Collection Practices Act,"* 27 Drake L.Rev. 489, 524–26 (1977–78).

We further hold that the statutory minimum and maximum limits for penalties are the limits *in an action* brought under this section. The general rule is that "where the act prohibited is continuing in its nature, only one penalty is incurred up to the time when an action therefor is commenced." 70 C.J.S. *Penalties* § 3b(2) (1981). *See also* 36 Am.Jur.2d *Forfeitures and Penalties* § 65 (1981) ("[A] statute imposing a penalty will be deemed noncumulative unless its language clearly expresses a contrary intent."). The *Harvey* court held that the federal act's penalty ceiling of $1000 imposed a limitation per action and not for each occurrence of a violation as the consumer in that case argued. The court stated:

> [I] find that the $1,000 per action limitation does not defeat the purpose of the Act and is consistent with its provisions. Section 1692k(a)(2)(A) specifically provides that "in any action" the court may allow damages "not exceeding $1,000." Subsection (a)(1) provides that a plaintiff may always recover any actual damage sustained, and subsection (a)(3) provides for an award of attorney fees and costs. Where noncompliance by the debt collector is frequent or persistent, the Court must consider that factor when determining the amount of statutory damages. It appears that the intent of Congress is that in an aggravated case of persistent and repeated illegal practices, the full $1,000 should be awarded; in other cases the Court has discretion to award any amount less than that or nothing at all in

addition to actual damages. Congress has provided the Court with a range so that the award in any case can be tailored to fit the particular facts. Additionally, section 1692k(a)(2)(B) provides for a maximum award of up to $500,000 in statutory damages in a class action for violations of the Act, so that Congress has provided other remedies in the case of repeated similar practices by a single debt collector.

*Harvey,* 509 F.Supp. at 1222. In assessing the amount of the penalty, the court may consider the frequency or persistency of the violations. We thus remand this case for further decision on the existing record regarding the amount of the penalty to be paid by Public Finance under section 537.-5201(1) of the Iowa Code not exceeding $1000.

Penalties awarded to a consumer may be set off against the consumer's obligation to the creditor. Section 537.-5201(8) also directs the court to award the successful debtors costs and reasonable attorneys fees for services—in this case in connection with the counterclaim. The fees are to be determined by the value of time reasonably spent, and not by the amount of the consumer's recovery. *Id.* We hold that such an award of costs and fees includes those relating to this appeal, insofar as it relates to the counterclaim. This court has previously held that an award of attorneys fees under section 537.5201(8) includes fees for both district court and appellate court services. *Sheffield Savings Bank v. Klages,* 294 N.W.2d 55, 57 (Iowa 1980); *First Northwestern National Bank v. Crouch,* 287 N.W.2d 151, 154 (Iowa 1980). On remand the district court is also to fix the attorney fees in both courts and to tax the costs in district court. We tax the costs in this court one-half to Public Finance and one-half to the Van Blaricomes.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.