TIM O'NEILL CHEVROLET,
INC., Appellant,

v.

Gregory A. FORRISTALL, Appellee.

No. 95–636.

Supreme Court of Iowa.

July 24, 1996.

**612**

J. Russell Derr of Erickson & Sederstrom, P.C., Omaha, Nebraska, and Michael J. O'Bradovich, Council Bluffs, for appellant.

Daniel L. Fretheim of Smith Peterson Law Firm, Council Bluffs, for appellee.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

LAVORATO, Justice.

A car dealer sued a customer for repairs to the customer's car. The customer counter-claimed, seeking damages for the dealer's alleged violations of Iowa's consumer credit code. The alleged violations stemmed from the customer's purchase of a new car. The customer also counterclaimed for damages because of the dealer's alleged negligence in forwarding the new car registration to the county treasurer. The district court found against the dealer on its claim and for the customer on his counterclaim.

Finding no error, we affirm on the dealer's appeal. We remand for a determination of appellate attorney fees for the customer.

### I. *Background Facts.*

In late November 1993, Greg Forristall was involved in an automobile accident that damaged his 1991 Chevrolet Beretta. He had purchased the car from Tim O'Neill Chevrolet, Inc. (dealer). After conferring with the other party's insurance company, State Farm Insurance, Forristall had the Beretta towed to the dealer for a damage estimate.

On December 4 Forristall went to the dealer to look at new cars. A salesperson told Forristall that he would receive a "good deal" because he had made two prior purchases from the dealer.

On December 6 Forristall stopped at the dealer to retrieve personal effects from his damaged Beretta. Jim Warner, the dealer's new body shop manager, showed Forristall a parts order for seat rails. Forristall was surprised because he had not authorized this repair, nor did Warner give him a written repair estimate. Forristall testified that, at this meeting, he did ask Warner for a cost of repair estimate. Warner told him that "it was his first day of work [as body shop manager] and he did not know where it was."

After this meeting, Forristall became concerned that the Beretta could not be restored to its pre-accident condition. He again contacted State Farm. A State Farm adjuster suggested that if Forristall did not want to keep the Beretta, he should ask the dealer if he could trade in the Beretta "as is."

Forristall called the dealer on December 7. He spoke with Mike O'Neill, the sales manager. (Mike O'Neill testified that he is no relation to Tim O'Neill, the dealer's owner.) Mike O'Neill quoted Forristall $7995 as the purchase price for a new 1994 Beretta, with the 1991 Beretta as a trade-in. Forristall refused to accept this offer because it was still too high. Mike O'Neill made a second offer, reducing the price by several hundred dollars. This offer also included the 1991 Beretta as a trade-in.

Forristall told Mike O'Neill he would accept this offer if he could obtain more from State Farm in settlement. When Forristall checked with State Farm, the adjuster told him he would increase the settlement to meet Forristall's needs. Forristall then called Mike O'Neill and accepted the deal.

On December 8 Forristall went to the dealer to finalize the agreement he and Mike O'Neill had reached on the phone. Mike O'Neill handled the negotiations and agreed to the terms of sale as the dealer's agent. The parties ultimately executed a written motor vehicle purchase agreement on the new 1994 Beretta.

This agreement was part of approximately fourteen documents prepared by the dealer's employees based upon the terms Forristall and Mike O'Neill had agreed to. One term of the purchase agreement listed the 1991 Beretta as a trade-in, with a $6600 credit for its value against the purchase price. None of the documents Forristall signed mentioned that he was required to pay the repairs of the Beretta he was trading in.

While the dealer's employees were preparing the documentation, Forristall told them he was going to State Farm to pick up the settlement check. When Forristall returned, he signed the papers and took possession of the new car. During this time, the dealer's employees never mentioned the settlement check.

On December 10 the dealer called Forristall and requested that Forristall's wife come to the dealer and sign papers. She later did so. And when she did, no dealer employee asked her to pay for the repairs to the damaged Beretta.

On December 17 Forristall stopped by the dealer to have "after-market" products installed on the 1994 Beretta. At this time no dealer employee asked for, or demanded, payment from Forristall for the repairs to the 1991 Beretta. Nor did any dealer employee ever present Forristall with a bill for repairs to the 1991 Beretta.

Body shop manager Warner called Forristall on December 21 when the dealer completed repairs on the 1991 Beretta. He asked Forristall when he was going to pay the $4676.60 repair bill on this car. Forristall told Warner there must be some mistake because he had traded in the 1991 Beretta "as is" as part of the deal on the 1994 Beretta. Forristall refused to pay the dealer the $4676.60 settlement from State Farm for the dealer's repairs to the 1991 Beretta.

The call from Warner was the first time dealer employees had ever told Forristall the repair bill was his responsibility. Forristall had never received an estimate nor a bill for the repairs before this call.

Forristall received three subsequent calls from dealer employees. The first call was from Warner. During their conversation, Warner accused Forristall of being dishonest. Warner threatened to publicly embarrass Forristall by serving him with suit papers at Iowa Western Community College, where Forristall served on the Board of Trustees. Within a short time, Forristall received a second call. This time it was sales manager Mike O'Neill, who called Forristall a deadbeat and a liar. The final call was from another dealer employee, who unsuccessfully attempted to convince Forristall he owed the dealer for the contested repair costs. Forristall told this employee he had traded the vehicle "as is" and was not going to pay for the repairs.

The phone calls were not the final salvo in this skirmish. When the parties executed the December 8 purchase agreement, a dealer employee told Forristall he would receive title to his new car within twenty days. In fact, Forristall did not receive the title until approximately February 8, 1994. This was after (1) Forristall's attorney began investigating the situation, and (2) the lending institution that held the paper on the new car deal intervened on Forristall's behalf.

## II. *Background Proceedings.*

The dealer filed a petition at law against Forristall, asking for $4676.60 in damages, costs and attorney fees, and any other relief the court felt was justified under the circumstances. Forristall answered, asserting a general denial. He also asserted an affirmative defense that the dealer had "failed to conduct itself in accordance with customs of industry and regulatory standards relating thereto."

In addition, Forristall asserted a counterclaim with several counts. At the start of the bench trial, Forristall dismissed all of the counts except for those alleging violations of Iowa Code chapter 537, the Iowa Consumer Credit Code, and a negligence claim under Iowa Code section 321.25.

In its ruling, the district court dismissed the dealer's claim. As to Forristall's counterclaim, the court found (1) the consumer credit code applied to the sales transaction, and (2) the dealer had violated several provisions of this code. The court awarded Forristall statutory damages for these violations and statutory attorney fees. The court also found the dealer was negligent in forwarding the new car registration to the county treasurer and awarded Forristall damages on this claim as well.

The dealer appealed all of these rulings.

## III. *Scope of Review.*

The dealer's petition was filed at law, so our review is on error. Iowa R.App.P. 4. If supported by substantial evidence, the district court's findings are binding on us. The district court's legal conclusions, however, are not. *Atwood v. City of Des Moines,* 485 N.W.2d 657, 659 (Iowa 1992). Evidence is substantial if reasonable minds could accept it as adequate to reach the same findings. *Mastland, Inc. v. Evans Furniture, Inc.,* 498 N.W.2d 682, 684 (Iowa 1993).

When the challenge to the district court's ruling is lack of substantial evidence, we view the evidence in the light most favorable to the judgment. In our review, we liberally construe the district court's findings to uphold, rather than defeat, the result reached. *Claus v. Whyle,* 526 N.W.2d 519, 523 (Iowa 1994). Additionally, in our review, the question we face is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made. *Second Injury Fund of Iowa v. Braden,* 459 N.W.2d 467, 468 (Iowa 1990).

The trier of fact—here, the district court—has the prerogative to determine which evidence is entitled to belief. *Claus,* 526 N.W.2d at 524. The district court has a better opportunity than we do to evaluate the credibility of witnesses. So we think factual disputes depending heavily on such credibility are best resolved by the district court. *Id.*

Our task is not to weigh the evidence or the credibility of the witnesses. *Id.* Rather, our task is to determine whether substantial evidence supports the district court's findings according to those witnesses whom the court believed. *Id.*

## IV. *The Dealer's Claim for Cost of Repairs.*

The dealer contends the district court erred in finding the dealer was not entitled to judgment against Forristall for the cost of repairs to the 1991 Beretta. The fighting issue under this assignment of error concerns a term of the purchase agreement involving the damaged 1991 Beretta. The dealer argues the parties agreed Forristall would pay for the dealer's repairs on this car. Forristall, on the other hand, argues he traded the 1991 Beretta "as is."

The dealer points out that four employees involved in the transaction testified that Forristall knew he had to pay for the repairs. The dealer also points out that two of these employees were no longer working for the dealer at the time of trial.

Forristall counters with the documents, none of which said anything about Forristall paying for the repairs. The district court relied on the same documents, saying:

> [The dealer] is claiming the transaction contemplated that Forristall was to repair his damaged vehicle and the used car trade-in allowance on the sales agreements of $6600 was an allowance based upon the 1991 vehicle in a repaired condition. This position by [the dealer] borders on being preposterous for numerous reasons. [The dealer] cannot expect reasonable people to believe that fourteen different documents prepared by [dealer] employees under the supervision of the sales manager would not have provided for the trade-in vehicle to be repaired if that had been a condition of the transaction.

The district court also relied on four other key pieces of evidence in reaching the conclusion that the dealer failed to prove Forristall had authorized the repairs. First, in its answers to interrogatories, the dealer stated Mrs. Forristall authorized the repairs of the vehicle when she brought the vehicle to the collision repair center. The evidence disclosed she did not take the damaged vehicle in for repairs, nor was there any proof she authorized repairs.

Second, when the dealer contacted Forristall to have his wife come in to sign the papers, the dealer made no demand on Forristall to pay the cost of repairs. Nor did the dealer make such a demand on Mrs. Forristall when she went in to sign the papers.

Third, the dealer claimed State Farm's adjuster authorized the repairs. The adjuster testified he never authorizes the repair of damaged vehicles. This is so, he testified, because the claimant, not the insurance company, decides whether to repair the damaged vehicle.

Last, the dealer presented no written evidence that Forristall authorized the repairs.

Nor did the dealer present any written evidence that it had any reasonable and honest expectation that Forristall would pay for the repairs.

The district court indicated it decided this case in part on the credibility of the witnesses. The court believed Forristall when he testified that he did not agree to pay for the cost of repairs to the damaged Beretta. The court did not believe the dealer's witnesses who testified otherwise.

We conclude substantial evidence supports the district court's finding that the parties never agreed Forristall would pay for the cost of repairs.

## V. *Forristall's Counterclaim.*

■ A. *Applicability of the consumer credit code.* A "consumer credit sale" is defined under Iowa Code section 537.1301(12)(a) (1993) as

> a sale of goods, services, or an interest in land in which all of the following are applicable:
>
> (1) *Credit is granted* either pursuant to a seller credit card or *by a seller who regularly engages as a seller in credit transactions of the same kind.*
>
> (2) The buyer is a person other than an organization.
>
> (3) The goods, services, or interest in land are purchased primarily for a personal, family, or household purpose.
>
> (4) *Either the debt is payable in installments or a finance charge is made.*
>
> (5) With respect to a sale of goods or services, the amount financed does not exceed twenty-five thousand dollars.

(Emphasis added.)

The parties dispute the basis for the dealer's damage claim. The dealer says its claim is based upon a separate repair agreement between it and Forristall. This agreement, the dealer argues, is not a consumer credit sale, so it is not subject to the provisions of chapter 537.

Forristall argues the dealer's claim arises from the December 8 motor vehicle purchase agreement, a consumer credit sale subject to the provisions of chapter 537.

The dealer attempts to escape the application of chapter 537 to its repair claim by arguing that the repair of the damaged 1991 Beretta and the purchase of the new 1994 Beretta were negotiated in two separate agreements. The dealer contends it and Forristall executed a separate agreement for purchase of repair services. So, the dealer argues, under the italicized language of section 537.1301(12)(a) above, the repair agreement was not a credit transaction for two reasons. First, the dealer does not regularly engage as a seller in credit transactions. Second, the debt was not payable in installments and the dealer did not make a finance charge to Forristall. Therefore, the dealer concludes, the repair agreement was not a consumer credit sale as defined by section 537.1301(12)(a).

Forristall replies that the trade-in of the 1991 Beretta and purchase of the new 1994 Beretta arose from the parties' execution of a single agreement—the December 8 motor vehicle purchase agreement. Forristall asserts that this agreement met all the elements of a consumer credit transaction as defined by section 537.1301(12)(a). So, he concludes, chapter 537 does apply. We agree.

As mentioned, the district court found Forristall never authorized the dealer to repair the 1991 Beretta. There never was a separate repair agreement. The only agreement in evidence is the motor vehicle purchase agreement. Therefore, regardless of whether Forristall was obligated to pay for the repairs, any dispute in this regard necessarily arose from the motor vehicle purchase agreement. The motor vehicle purchase agreement provides for the trade-in of the 1991 Beretta.

As the district court concluded, the motor vehicle purchase agreement is subject to the provisions of chapter 537 for the following reasons. First, Iowa Code section 322.33(1) provides that the Iowa Consumer Credit Code applies "to a consumer credit sale in which a licensed motor vehicle dealer participates or engages." The dealer is a licensed motor vehicle dealer and did participate in the sale of the 1994 Beretta to Forristall.

Second, the new car sale and the trade-in constituted a consumer credit sale as defined

in section 537.1301(12)(a). The security agreement Forristall signed as part of the transaction states that it is a consumer credit contract. *See, e.g., First N.W. Nat'l Bank v. Crouch,* 287 N.W.2d 151, 153 (Iowa 1980) (where promissory note provided "[t]his loan is subject to the provisions of the Iowa Consumer Credit Code applying to consumer loans," and "[t]his is a consumer credit transaction," the transaction was subject to Iowa Consumer Credit Code, even though transaction was not subject to Iowa Consumer Credit Code by force of statute alone). In the security agreement, the dealer granted Forristall credit to finance the purchase of the new vehicle. The security agreement called for twenty-four monthly payments of $230.10. In the same security agreement, the dealer assigned its interest under the agreement to Norwest Bank. Forristall is a person. The new vehicle was primarily for personal and family use. The amount the dealer financed is less than $25,000.

■ B. *Substantial evidence that the dealer engaged in prohibited debt collection practices under Iowa Code chapter 537.* The dealer's fallback position is that there is not substantial record evidence it engaged in prohibited debt collection practices under chapter 537. The dealer argues that nothing said in the three telephone calls to Forristall falls within the definition of a prohibited debt collection practice. Forristall, of course, argues there is substantial record evidence to support the district court's finding that the dealer did engage in such practices.

The district court found that in the telephone calls the dealer's employees used abusive language toward Forristall. The court concluded the language used constituted a violation of the consumer credit code. For reasons that follow, we conclude there is substantial evidence to support the court's findings and conclusions.

Iowa Code section 537.7103 enumerates a variety of prohibited debt collection practices under the consumer credit code. It pertinently provides:

2. A debt collector shall not oppress, harass or abuse a person in connection

with the collection or attempted collection of a debt of that person or another person. The following conduct is oppressive, harassing or *abusive* within the meaning of this subsection:

a. The use of profane or obscene language or *language that is intended to abuse the hearer or reader and which by its utterance would tend to incite an immediate breach of the peace. ...*

(Emphasis added.)

In the telephone calls to Forristall, one of the dealer's employees said Forristall was dishonest. Another called him a dead beat and a liar.

The issue is whether these words are "language that is intended to abuse the hearer and which by its utterance would tend to incite an immediate breach of the peace." This is a mixed question of fact and law.

The consumer credit code does not define "abuse." The ordinary meaning of "abuse" is "to attack or injure with words." Webster's Third New Int'l Dictionary 8 (P. Gove ed. 1965).

When the legislature used the language "which by its utterance would tend to incite an immediate breach of the peace," we think it had in mind "fighting words." "Fighting words" have been described as "those personally abusive epithets which 'by their very utterance inflict injury or *tend to incite an immediate breach of the peace.'*" *State v. Fratzke,* 446 N.W.2d 781, 784 (Iowa 1989) (citations omitted) (emphasis added).

"Breach of the peace" means a "violation or disturbance of the public tranquility and order." Black's Law Dictionary 189 (6th ed.1990). The term "breach of the peace" is generic. The term includes "all violations of public peace or order and acts tending to a disturbance" of the public peace or order. *Id.*

We think a fact-finder could easily characterize "dishonest," "dead beat," and "liar" as "fighting words" because they attack a person's integrity. We think any reasonable person would conclude that their very utterance would tend to incite an immediate breach of the peace. And such conclusion is

not lessened by the fact that the words were uttered in a telephone conversation.

We conclude there was substantial evidence that the dealer's employees used language that was intended to ·abuse Forristall and which by its utterance would tend to incite an immediate breach of the peace. The district court therefore correctly concluded that the dealer engaged in a prohibited debt collection practice under chapter 537.

C. *Appellate attorney fees.* Because the dealer violated the consumer credit code, Forristall is entitled to appellate attorney fees in addition to the attorney fees the district court awarded. *See* Iowa Code § 537.5201(8); *Public Fin. Co. v. Van Blaricome,* 324 N.W.2d 716, 726 (Iowa 1982). We remand to the district court to fix the appellate attorney fees.

D. *Substantial Evidence that the Dealer Was Negligent Per Se in Forwarding Registration on the 1994 Beretta to the County Treasurer.*

■ Under Iowa Code section 321.25, the dealer *shall* forward the application [for registration and certificate of title] by the purchaser to the county treasurer ... within fifteen calendar days from the date of delivery of the vehicle.

(Emphasis added.)

One count of Forristall's counterclaim asserted that the dealer was negligent per se for failing to forward his application within fifteen days of December 8, the date the dealer delivered possession of the new car. The district court found the dealer failed to forward the application to the county treasurer for thirty-two days after Forristall's temporary license expired on January 7. *See* Iowa Code § 321.25 ("A vehicle may be operated upon the highways of this state without registration plates for a period of thirty days after the date of delivery of the vehicle to the purchaser from the dealer if a card bearing the words 'registration applied for' is attached on the rear of the vehicle."). The court awarded Forristall $640 in damages ($20 per day × 32 days) for the loss of use of the 1994 Beretta between January 7 and February 8 when Forristall finally received

his permanent registration and certificate of title.

The dealer disputes that it failed to send the application within the fifteen-day time period required by section 321.25. The dealer asserts there is no evidentiary support for the district court's conclusion that it was negligent in forwarding the application for registration and certificate of title on the 1994 Beretta to the county treasurer. The dealer therefore concludes the court's $640 damage award was really an award of punitive damages that must be vacated. Alternatively, the dealer argues that, even if it was negligent, Forristall did not prove he was damaged by the delay.

Forristall contends the undisputed facts support the district court's findings and damage award.

Our careful review of the record clearly establishes that Forristall's ultimate receipt of registration and certificate of title were almost exclusively the product of his own efforts. He repeatedly called the county treasurer's office to see if the dealer had sent the application. He contacted an attorney to investigate the situation. He asked his lender who financed his loan for the 1994 Beretta why he should continue to make payments on a vehicle he could not drive. Only the entreaties of the bank finally spurred the dealer to contact Forristall and drop the application—along with the $493.75 Forristall paid for tax, title, and license—in the mail.

Between December 8 and February 8, Forristall did have a four-wheel truck to drive. However, this was primarily a farm vehicle. Forristall carried his tools in the uncovered truck bed. He never drove the truck off the farm because he did not want his tools to be stolen. Once his temporary registration on the 1994 Beretta expired on January 7, he could not legally drive it on any highway. *See* Iowa Code § 321.98 (operation on highway of any vehicle required to be registered and titled under chapter 321 without valid registration and license is a simple misdemeanor). As the district court implicitly found, Forristall effectively was without any off-farm transportation for approximately one month.

Section 321.25 does not *suggest* that sellers forward applications for registration and title to the county treasurer within fifteen days of purchase. It *requires* them to do so. *See, e.g.,* Iowa Code § 4.1(30)(a) (When used in a statute, the word "shall" imposes an affirmative duty.); *State ex rel. Lankford v. Allbee,* 544 N.W.2d 639, 641 (Iowa 1996) (same).

The dealer indisputably failed to comply with the clear terms of section 321.25. This failure to comply with the statute was negligence per se. *See, e.g., Wright v. Welter,* 288 N.W.2d 553, 556 (Iowa 1980) (Violation of a statutory duty is negligence per se.). The record amply supports the district court's finding that the dealer was negligent. Forristall was entitled to the $640 in damages the court awarded him for thirty-two days (January 7—February 8) for the loss of use of the 1994 Beretta due to the dealer's negligence.

## VI. *Disposition.*

We conclude substantial evidence supports the district court's findings that (1) the parties never agreed Forristall would pay for the cost of repairs for the 1991 Berretta; (2) the consumer credit code applied to the new car purchase agreement; (3) the dealer engaged in a prohibited debt collection practice under Iowa Code chapter 537; and (4) Forristall sustained damages because of the dealer's negligence in forwarding the registration on the new car to the county treasurer. We also conclude Forristall is entitled to appellate attorney fees because of the consumer credit code violation. We remand for a determination of these fees.

Finding no error, we affirm.

**AFFIRMED AND REMANDED.**

NEUMAN, J., concurs in the result.