# IN THE COURT OF APPEALS OF IOWA

No. 14-0690
Filed February 11, 2015

**POCAHONTAS AERIAL
SPRAY SERVICES, L.L.C.,**
       Plaintiff-Appellee,

**vs.**

**HEATHER GALLAGHER and
BLUE SKY SPRAY SERVICE, L.L.C.,**
       Defendants-Appellants.

_____

Appeal from the Iowa District Court for Pocahontas County, Kurt J. Stoebe, Judge.

Heather Gallagher and Blue Sky Spray Service, L.L.C. appeal from judgment entered against them in this action for misappropriation of trade secrets and breach of fiduciary duty. **AFFIRMED IN PART, REVERSED AND MODIFIED IN PART, AND REMANDED WITH DIRECTIONS.**

David W. Nelmark of Belin McCormick, P.C., Des Moines, for appellants.

Andrea M. Smook of Cornwall, Avery, Bjornstad, Scott & Davis, Spencer, for appellee.

Heard by Danilson, C.J., and Doyle and Bower, JJ.

**DANILSON, C.J.**

Pocahontas Aerial Spray Services, L.L.C. (PASS), an agricultural aerial spraying business, brought this action for damages and injunctive relief against its former employee, Heather Gallagher, and her newly established agricultural aerial spraying business, Blue Sky Spray Service, L.L.C., alleging misappropriation of trade secrets and breach of fiduciary duty. The defendants appeal from an adverse judgment, contending there is insufficient evidence to establish the existence of a trade secret or its misuse. They contend the trial court erred as a matter of law because PASS did not protect its customer list sufficiently for it to constitute a trade secret. They also assert the damages awarded are not supported by sufficient evidence and there is no basis for imposing the lengthy injunction ordered by the trial court. We affirm judgment for PASS but reverse the damages awarded, amend the length of the injunction, and remand with directions.

**I. Scope and Standard of Review.**

Because the standard of review largely determines the outcome of this appeal, we set it out first. The case was tried at law, and the scope of review is for errors at law.[1] Iowa R. App. P. 6.907 (2009); *Van Sloun v. Agans Bros.*, 778 N.W.2d 174, 179 (Iowa 2010). Under this standard of review, the trial court's findings carry the force of a special verdict and are binding if supported by

---

[1] *Harrington v. Univ. of N. Iowa*, 726 N.W.2d 363, 365 (Iowa 2007) ("The fact that injunctive relief was sought is not dispositive of whether an action is at law or in equity, as an injunction may issue in any action." (citation, quotation marks, and alterations omitted)).

substantial evidence. *Van Sloun*, 778 N.W.2d at 179. We are not, however, bound by the trial court's legal conclusions. *Id.*

"Evidence is substantial if reasonable minds could accept it as adequate to reach the same findings." *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996). We view the evidence in the light most favorable to the judgment, liberally construing the district court's findings to uphold, rather than defeat, the result reached. *Id.* "[T]he question we face is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made." *Id.*

The district court, as the trier of fact, "has the prerogative to determine which evidence is entitled to belief." *Id.* Having had the better opportunity to evaluate the credibility of witnesses, we are mindful that "factual disputes depending heavily on such credibility are best resolved by the district court." *Id.*

**II. Background Facts and Proceedings.**

Viewing the evidence in the light most favorable to upholding the trial court's decision, including all reasonable inferences, the following facts reasonably could be found. Kyle Scott and Edgar Newberg purchased an aerial spraying business from Norman Hartsock in May 2008 for $125,000 in cash plus $1.00 per acre sprayed for five years.[2] They purchased the hangar, which Scott testified had a value of $45,000 to $80,000, as well as the use of a loading pad owned by the city of Pocahontas. When Scott and Newberg purchased the business, Hartsock "took [them] around and introduced [them] to the co-op locations that he was working for and he also did an ad in the newspaper and

---

[2] The total price paid as of May 2013 was $340,390.18.

telling people that he had sold to" PASS. Hartsock recommended Scott and Newberg hire Heather Gallagher to assist them in the office. Gallagher was the daughter of Hartsock's friend and was looking for work; she had no prior experience with aerial spraying.

Over the course of the next five years, Gallagher learned the aerial spraying business, helped develop the client relationships and customer base, and was entrusted with increasing responsibilities. In 2010, Gallagher became operations manager of PASS. She had possession of the company laptop and controlled the pilot spray logs, aerial maps, and pricing information. Gallagher worked full-time July into September and part-time the rest of the year. Her compensation consisted of an hourly wage, mileage to drive to and from work and to run errands for the business, and a per-acre "Christmas bonus."[3] In addition, PASS paid for Gallagher's association membership dues and for her to attend annual state and national conventions, where she received training and certification.

In September 2012, Gallagher began soliciting business from PASS's customers.

On November 16, 2012, Gallagher filed with the Iowa Secretary of State a certificate of existence for Blue Sky Spray Service, LLC.

In December 2012, Gallagher and Scott attended the national convention in Savannah, Georgia. Gallagher received her annual bonus while at the convention.

---

[3] Beginning in 2009, Gallagher received an escalating bonus—beginning five cents per acre at 25,000 acres and ranging to twelve cents per acre at 100,000 acres and above— for each acre sprayed by any pilot affiliated with PASS.

Gallagher terminated her employment with PASS on January 15, 2013, leaving the company laptop, keys to buildings, and credit cards at the airport counter for Scott to retrieve.

On February 6, 2013, Gallagher submitted a business plan for Blue Sky to a bank, reporting PASS will be Blue Sky's "primary competition"—"The owners of that business live out of state and have had little to no contact with existing customers over the past five years." She states, "Blue Sky Spray Service, LLC's strategy is to start with customers with which there is already an existing relationship. First Cooperative in Laurens and Marathon and several farmers have expressed a commitment to obtain aerial spraying services for the 2013 season." The business plan also provides:

> According to the USDA, National Agricultural Statistics Service, Pocahontas County 2010 farmland estimates total 790 farms, with a total of 360,000 acres. . . . Managers at First Cooperative in Laurens and Marathon have agreed to work with Blue Sky Spray Service, LLC for the 2013 season; their acres from 2012 totaled 20,000.
> Competitors include Pocahontas Aerial Spray Service and area cooperatives that employ their own pilots (New Cooperative, Wells Ag Center, Ag Partners). Because I have been a manager for the past five years, the customers I work with trust me to do the job well. The pilot who I will be working with is excellent; I worked with him last year and he was able to meet many of the customers and establish relationships with them. Advantages to using my company are the relationships I have and will continue to develop with my customers. . . . We are priced competitively, as some other area businesses are charging at least $10/acre for application. Blue Sky Spray Service, LLC's pricing will remain at approximately $9.25/acre for application for the 2013 season.
> . . . .
> Managers at First Cooperative that I worked with last year have agreed to work with me this year. Last year we sprayed approximately 20,000 acres for First Cooperative. I have also been in contact with other ag centers and farmers I have worked with for the past five years, and many of them have also agreed to work

with me this year. Because of that, I am conservatively basing my beginning operating expenses on 30,000 acres.

Spraying 30,000 acres during the season at a rate of $9.25 brings the pilot pay to $166,500.

On February 9, 2013, Gallagher sent a mailing thanking the recipients for "your aerial application business during the past years," stating her commitment to "continue providing you with excellent service and timely applications," and further that "Thad Cooper will be returning as our pilot again this year."

PASS filed this action for damages and injunctive relief against Gallagher and Blue Sky Spray Service, L.L.C. (collectively Gallagher), alleging misappropriation of trade secrets and breach of fiduciary duty.

Following an August 26, 2013 hearing on the request for a temporary injunction, on August 27, 2013, the district court found "Gallagher accessed PASS's computer system on December 12 and December 24, 2012. She also accessed the computer on January 9 and January 12, 2013. On January 9, 2013, and December 24, 2012, the accesses were with a USB device, which would be consistent with downloading proprietary information." It further found,

> PASS is entitled to an injunction as provided by Iowa Code section 550.3 [(2013)]. The great harm that has been suffered by PASS is clearly demonstrated by the testimony that in 2012 PASS sprayed 42,000 acres. In 2013, PASS sprayed approximately 3000 acres. PASS has the ability to perform the work. There is spraying work available yet this year and solicitation for work in 2013 will begin soon. PASS is entitled to a temporary injunction.

The court issued a temporary injunction, prohibiting Gallagher from contacting "any existing customers of [PASS] as of February 1, 2013," which was to continue until modified or superseded by court order.

A bench trial was held on February 5, 2014. On May 28, 2014, the trial court issued its ruling in which it made the following credibility determinations:

> In order to explain the Court's findings, the Court must discuss Gallagher's credibility. The Court found Gallagher's testimony to be unreliable. The Court heard her testimony in the hearing on the plaintiffs' request for a temporary injunction and the trial. In both proceedings, the Court had the opportunity to assess her demeanor which is not reflected in the transcript.
>
> The impact of Gallagher's deportment, eye contact and body movements, along with graphic contradictions and avoidance of questions, revealed a desire to testify without regard to the truth and with the goal of avoiding responsibility for designing, executing and concealing a plan to take the successful business that PASS had purchased and grown. Her version of events was loosely moored to undeniable events. Otherwise, it was plotted to achieve her goal. Her explanation of events bordered on the ridiculous at times and her justification for her action was often astonishing.
>
> On the other hand, the Court found the testimony of Scott, Newberg, and Tamara Anderson [in Scott's Colorado office] to be credible, frank and reliable. They demonstrated strong physical attributes of credibility while testifying. They admitted evidence that was not favorable. Their testimony was reasonable and acceptable in light of events and the history of PASS. They were not defensive or argumentative during cross examination.
>
> The pilot spray logs, the customer list and pricing information of PASS are at the heart of this controversy. The defendants portray the customer list as easily assembled and of no particular value. Nothing could be farther from the truth. . . .
>
> . . . .
>
> Gallagher denies that she had the pilot spray log, customer list or pricing information. The Court does not believe her.

The trial court concluded Gallagher had misappropriated trade secrets of PASS, awarded damages in the amount of $118,000, and enjoined Gallagher from contacting or contracting with any customer of PASS until December 31, 2016.

The defendants appeal, contending there is insufficient evidence to establish the existence of a trade secret or its misuse. They assert the trial court erred as a matter of law because PASS did not protect its customer list sufficiently for it to constitute a trade secret, the damages awarded are not

supported by sufficient evidence, and there is no basis for imposing the lengthy injunction ordered by the trial court.

## III. Discussion.

There are three recognized prerequisites for relief based on the misappropriation of a trade secret: (1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret. *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997). The plaintiff has the burden to establish each of these elements by a preponderance of the evidence. *Id.*

Iowa Code section 550.2(4) (2013) provides:

"Trade secret" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

As our supreme court has stated:

Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 647 (Iowa 1995) (citation and internal quotation marks omitted). Whether particular information constitutes a trade secret is "a mixed question of law and fact." *Id.* at 648. The

"legal part of the question" is whether the information in question could constitute a trade secret under the first part of the definition of trade secret in section 550.2(4). *Id.* The "fact part of the question arises from the remaining" part of the statutory definition found in subdivisions (a) and (b) of section 550.2(4). *Id.*

Gallagher characterizes the district court's ruling as a determination that a "customer list" was a trade secret. This characterization reads the court's ruling too narrowly. The district court determined as a legal matter that the "pilot spray logs, the primary customer list, and pricing history" constituted trade secrets. We find no error in the court's ruling that such information—so long as the remaining factual tests are met—can constitute a trade secret. *See id.* at 647.

As to the "fact part of the question," it is our task to determine if substantial evidence supports the trial court's findings that the information "(a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use" and "(b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Iowa Code § 550.2(4); *see also Econ. Roofing*, 538 N.W.2d at 648.

*A. Trade secrets existed.* The trial court's finding that trade secrets existed is supported by substantial evidence. The co-owners of PASS and Tamara Anderson, bookkeeper for Scott Aviation in Colorado, testified at trial to the existence of pilot spray logs, the primary customer list, and pricing history. The co-owners also testified regarding the use of that data and that the customer list and base were valuable assets for PASS—noting they were a strong factor when the current owners decided to purchase PASS. Even Gallagher testified

that a customer list is an asset of a company and provides value to the company. When the company laptop was returned to PASS, it had been stripped of all of the company's information, including the customer list, pricing history, and pilot spray logs. PASS had to spend considerable time and efforts to recreate the information and lists. Gallagher asserts no customer list, spray logs, or pricing history existed—the court "ga[ve] little weight to Gallagher's denial," noting:

> The Court took great stock in the testimony of Tamara Anderson. Anderson is the bookkeeper for Scott Aviation in Colorado. She explained consistently and in detail her duties as it related to PASS. Scott owns 50 percent of PASS and all of Scott Aviation. Scott Aviation performed accounting services for PASS. Gallagher forwarded payments that she received to Anderson. Anderson deposited incoming revenues, made payroll, prepared monthly reports and paid expenses.
> Gallagher had limited access to the computerized accounting. She was supplied with the computer program QuickBooks. Gallagher billed customers using the limited customer list on QuickBooks. So, a limited customer list, reflective of these billings, was available to Gallagher through QuickBooks. But this is not the customer/pricing list that is the heart of this controversy.
> Anderson identified another and more important customer list. She described this as a list of current and potential customers. The list was maintained solely on Gallagher's computer. It was used to print customer labels for direct mailings. The pricing information was also on Gallagher's computer and was necessary for Gallagher to prepare billings. The pilot spray logs were maintained by Gallagher on the computer because they were required by regulators.

PASS did not authorize Gallagher or Blue Sky to take or use this information.

Additionally, PASS meets the essential elements for establishing trade secrets. Generally a customer list is a trade secret if the list was developed or obtained through substantial effort, if the company took reasonable efforts to protect the information's secrecy. *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 229 (Iowa 1977). As was the case in *Basic Chemicals*, "There was only one

set [of the information] and [Gallagher] was the only person given unlimited access to those books." *See id.*

*B. The information was acquired through a confidential relationship.* Gallagher obtained the customer list through a confidential relationship. Gallagher argues the trial court erred in determining the information at issue here constituted a trade secret because custumers' identities were available to her—an at-will, hourly employee, who signed no confidentiality or non-compete agreement. While Gallagher identifies herself as an hourly, at-will employee in appellate briefings, she identified herself quite differently in her business plan and to PASS customers.

> [A] principal and agent relationship necessarily gives rise to a fiduciary relationship. And a principal and agent relationship necessarily includes an employer and employee relationship. Employees constantly act on behalf of employers. In doing so, employees have the confidence and trust of their employers. That is the essence of the relationship.

*Econ. Roofing*, 538 N.W.2d at 648 (citing *Kurth v. Van Horn*, 380 N.W.2d 693, 695-96 (Iowa 1986)).

Given their relationship and the definition of "misappropriation" in Iowa Code chapter 550, we think the trial court as fact finder could easily find that Gallagher had a fiduciary duty to maintain the secrecy of the information PASS described as trade secrets—its customer list, pricing history, and pilot spray logs.

> The law is well settled that knowledge acquired by an employee during h[er] employment cannot be used for h[er] own advantage to the injury of the employer during the employment; and after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which [s]he has acquired in the course of h[er] employment, for h[er] own benefit or that of a competitor to the detriment of h[er] former employer.

*Basic Chems.*, 251 N.W.2d at 230.

There is no doubt Gallagher was a manager for PASS. She signed documents as the manager, the co-owners both testified that she was the manager, and she, herself, testified she was management. Additionally, the employer-employee relationship is regarded as being a confidential relationship, and Iowa courts regard that relationship as one between fiduciaries. *See Uncle B's Baker, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1430 (N.D. Iowa 1996), and cases cited therein. Because of that, employees are prohibited from disclosing or using trade secret information they obtain during employment even absent a written agreement to that effect. *See Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 7-8 (Iowa 2008) (discussing scope of employee's duty not to use or disclose trade secrets of employer); *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 242 (Iowa 1988). There was credible evidence presented that Gallagher was soliciting customers before she quit her employment.

*C. The use and acquisition of the trade secret was unauthorized*. Gallagher acquired and used the confidential information in an unauthorized manner or by improper means.[4] The Iowa Code defines misappropriation as acquisition, disclosure, or use of a trade secret by a person who knows that the trade secret if acquired by improper means. Iowa Code § 550.2(3). This if further defined as use or acquisition through theft, bribery, misrepresentation,

---

[4] We acknowledge mere preparation to form a competing business organization is not actionable "unless it is shown that something in the preparation to compete produced a discrete harm to the former business beyond the eventual competition that results from the preparation." *Midwest Janitorial Supply Corp. v. Greenwood*, 629 N.W.2d 371, 376 (Iowa 2001) (finding "insightful" analyses in *Cudahy Co. v. Am. Labs., Inc.*, 313 F. Supp. 1339, 1346 (D. Neb. 1970), and *Bancroft-Whitney Co. v. Glen*, 411 P.2d 921, 936 (1966)).

breach, or inducement of a breach of a duty to maintain secrecy, or espionage. Gallagher misrepresented herself and her company to be affiliated with PASS and took the customer and pilot information from the company computer without permission. Additionally "improper means" does not need to mean that the trade secret was acquired, disclosed, or used in a way that was illegal. It also means the method in which the trade secret was acquired "falls below the generally accepted standards of commercial morality or reasonable conduct." *E.I. DuPont deNemours* & *Co. v. Christopher*, 431 F.2d 1012, 1013-14 (5th Cir. 1970) (citing the Restatement (First) of Torts § 757 cmt. f (1939)); *see* Iowa Code § 550.2(3)(a)-(c). "Improper means" include "breach of a duty to maintain secrecy." *Id.* § 550.2(1); *Econ. Roofing*, 538 N.W.2d at 646. The trial court finding that Gallagher's conduct met this standard is supported by substantial evidence.

Gallagher also asserts that PASS made no efforts to keep their customer information secret. This claim is unfounded. The efforts required to protect a trade secret depends on the circumstances of each case. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 549 (Iowa 1994) (stating that the crust recipe for a pizza place was considered a trade secret even though the recipe was disclosed to all employees because such disclosure was reasonable under the circumstances). In this case, the customer information, pilot spray logs, and pricing history were kept only on the work computer of the manager of the company. Upon her termination, the owners of the company requested the immediate return of that computer. As the trial court found, PASS should not be penalized for putting their trust in the wrong person.

*D. Evidence to establish damages.* Iowa Code section 550.4 provides in part,

> 1. . . . Damages may include the actual loss caused by the misappropriation, and the unjust enrichment caused by the misappropriation which is not taken into account in computing the actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a person's unauthorized disclosure or use of a trade secret.
> 2. If a person commits a willful and malicious misappropriation, the court may award exemplary damages in an amount not exceeding twice the award made under subsection 1.

PASS sought damages of $236,000—the amount it asserted was the loss of gross revenue as a result of Gallagher's unauthorized use of its trade secrets. The trial court found the "gross revenues include avoidable costs such as contract payments to pilots and supplies" and concluded "approximately one-half of the gross revenue would be paid to third parties [pilots] and should not be included in the assessment of damages." The court allowed $118,000 in damages.

On appeal, Gallagher contends PASS's "alleged damages are speculative because PASS's drop in revenue could have resulted from any number of causes unrelated to [Gallagher's] operations." The defendants also contend Scott's testimony established that PASS only retained forty percent of application revenue and that the other sixty percent went to the operator of the airplane that did the spraying. They assert a "correction of just this error would reduce PASS's damages from $118,000 to $94,400."

The trial court's findings are binding on us if supported by substantial evidence. *Miller v. Rohling*, 720 N.W.2d 562, 567, 572-73 (Iowa 2006). The trial

court's award of damages, which it calculated at 50% of gross receipts, is not supported by the record. In reviewing PASS's 2012 and 2011 partnership tax returns, we observe its net earnings were $17,533 for 2012 (gross receipts $446,274), and $53,887 for 2011 (gross receipts $602,944). However, adding back in depreciation as well as the one-dollar-per-acre payments PASS made to Hartsock (which were to end in 2013) results in net profits of $75,431 for 2012, and $120,710 for 2011. The net profits over gross receipts results in a percent net profit per dollar of gross revenue of 17% for 2012 and 20% for 2011[5]—not 50% of gross receipts.

PASS had gross revenue of $106,000 at the time of trial in 2013. PASS contends Blue Sky earned gross income of $236,000 from its former clients during 2013, excluding Gallaghers' relatives. The evidence thus supports a damages award of 20% of $236,000 or $47,200. Upon remand, the amount awarded to PASS must be reduced to $47,200. *See id.* at 573.

*E. Injunctive relief.* In its March 2014 ruling, the court ordered the injunction issued on August 27, 2013, continue in effect until December 31, 2016. The court found "Gallagher and Blue Sky violated the [temporary] injunction through joint action with Thad Cooper in continuing to serve PASS customers," but did not award additional damages because it found PASS "has submitted insufficient evidence of damages" from that breach. Gallagher argues the injunction and its extension until 2016 is unreasonable.

---

[5] $75,431 divided by $446,274 equals 16.9%. $120,710 divided by $602,944 equals 20%.

Though not entirely on point, we find guidance in *Presto–X–Company v. Ewing,* 442 N.W.2d 85 (Iowa 1989), where an employee violated his two-year restraint by providing service to his employer's customers almost immediately after being terminated. *See* 442 N.W.2d at 87. Our supreme court found the covenant was enforceable and the employee had violated the agreement, but that the two-year period would end shortly after the appeal. *See id.* at 89. The court held that where an employer receives the benefit of an injunction for only a fraction of the time specified in the covenant, it is necessary "to use our equitable powers to extend the restraint period, so as to accomplish full and complete justice between the parties." *See id.* at 89–90 (recognizing goal "to impose such terms and conditions as the justice and equities of the case require"). The court exercised its equitable powers to extend the covenant for one year from the date of the opinion. *Id.* at 90.

Cases from this jurisdiction and others suggest injunctive relief of six months to two years from the date of the decree may be appropriate. *See id.*; *see also Abbey Med./Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 195 (R.I. 1984) (declining "to dissolve the Superior Court order restraining for two years the defendants, their officers, agents, servants, employees, attorneys and all others in active concert or participation with them, from soliciting any business from the plaintiff's regular customers"); K.H. Larsen, Annotation, *Former Employee's Duty, In Absence of Express Contract, Not to Solicit Former Employer's Customers or Otherwise Use His Knowledge of Customer Lists Acquired in Earlier Employment*, 28 A.L.R.3d 7, at §28(a)-(c) (1969). *But see Huey T. Littleton Claims Serv. Inc. v. McGuffee*, 497 So.2d 790, 794 (La. Ct. App.

1986) (upholding court's order permanently enjoining the defendant from pursuing customers solicited prior to resigning).  Here, PASS has been awarded damages for the 2013 season and has had the benefit of the injunction for the 2014 spraying season.  We conclude the length of injunction imposed by the court is more than required to "accomplish full and complete justice between the parties."  *See Presto–X–Company*, 442 N.W.2d at 89–90.  On remand, the district court shall modify the injunction, which shall continue until December 31, 2015.  In total, PASS still receives damages or injunctive relief for a period of three years.

## IV. Conclusion.

Based on error in the trial court's calculation of damages, we reverse the judgment and remand for entry of new judgment in favor of the plaintiff in the amount of $47,200.  The district court shall also modify the injunction to terminate on December 31, 2015.

Costs on appeal are taxed three-fourths to Gallagher and one-fourth to Pocahontas Aerial Spray Services.

**AFFIRMED IN PART, REVERSED AND MODIFIED IN PART, AND REMANDED WITH DIRECTIONS.**