# IN THE COURT OF APPEALS OF IOWA

No. 19-0753
Filed August 5, 2020

**DECKER PRECISION MACHINING, INC.,**
    Plaintiff-Appellee,

**vs.**

**GO GREASE IT d/b/a G2IT LLC,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

A manufacturing start-up appeals from a district court decision that held it liable for breach of contract for failing to pay for custom parts. **AFFIRMED.**

Kenneth R. Munro of Munro Law Office, P.C., Des Moines, for appellant.

Todd J. Locher of Locher & Davis, PLC, Farley, for appellee.

Considered by Doyle, P.J., and Tabor and Schumacher, JJ.

**SCHUMACHER, Judge.**

This breach-of-contract case arises as a result of a dispute over parts supplied by a precision machining company to a manufacturing start-up for use in a prototype grease applicator. Central to the proposed device's operation was a pneumatic system, characterized by a short cylindrical piston fitting tightly within a cylindrical tube. The fit of these two parts was critical to the functioning of the prototype applicator, but when the manufacturer's hydraulic engineer received the finished parts, he discovered the piston did not fit the tube.

The manufacturer refused to pay for the entirety of the parts, highlighting the mismatched fit of the piston and tube. The manufacturer also alleged tardiness of delivery and various defects in other parts. The precision machining company sued for breach of contract and was awarded damages of $19,798.11 following a bench trial. The manufacturer appealed, arguing analytical flaws and inconsistent factual findings left the decision unsupported by substantial evidence. We affirm.

**Background and Procedural History**

Go Grease It (GGI) is a manufacturing start-up. In 2016, under the leadership of Mike Ryan, GGI sought to develop a new type of grease applicator that could transfer bulk lubricants, oils, and greases into reusable cartridges for use in various applications. GGI hired Cole Weber, a hydraulic engineer living in Minnesota, to spearhead the project. Wanting to build a prototype, Ryan and Weber contracted with Decker Precision Machining, Inc. (DPM) in the fall of 2016 for the production of parts for the applicator.[1] Throughout the course of dealing,

---

[1] DPM had completed prototypes for GGI in 2015 using the same tubing supplied by GGI.

DPM was represented by Randy Decker and Marty Koppes in emails and telephone consultations. The parties began exchanging quotes and purchase orders on October 31, 2016, and DPM commenced the machining of parts. Production was slowed by the need for clarification on prints. The purchase orders sent by GGI typically contained a term requiring order completion within three to eight weeks. GGI put the project on hold at one point. In a January 30, 2017 email, Ryan relayed the following to Decker and Koppes: "Please do not expend any more effort on any of these parts[.] After my last phone call with Marty and being informed of your continuing work backlog and further delay in delivery I need to reassess my options for getting parts[.]"

However, despite this email, the relationship continued. According to Decker's testimony, Ryan telephonically relayed to Decker on February 9, 2017, "Guess what? We're going to go ahead and go with this project again. It's not on hold. We're going to go with it. I agree with your quotes. The problem is I need them in two weeks." Decker replied that he could not deliver the parts in that time frame to which Ryan responded, "You will get them done. Just do your best." A final purchase order was sent on February 9, 2017, which asserted that order completion was required between February 17 and February 21. To save on shipping costs, GGI requested that all parts ship at the same time. DPM sent all the parts in two shipments, totaling over one hundred parts of over forty different types. The parts were shipped to Indiana, where Weber had resided since February. They arrived on February 22, 2017, and February 27, 2017.

Weber testified that after receipt of the parts he learned that two critical parts did not fit together. Specifically, these parts were a short Delrin

(polyoxymethylene) black cylinder that would serve as a piston and an eleven-inch length of polycarbonate that would serve as a reservoir for bulk liquids. The piston was designed with grooves in its outer edge so O-rings could be affixed. With the O-rings attached, the piston would create a seal against the inner wall of the cylindrical reservoir and give life to a pneumatic system. The pressurization of this system was crucial to the device's function, and the lack of fit was therefore fatal to the device's proposed function.

In a February 24, 2017 email, Weber informed DPM of the lack of fit:

Randy & Marty,
    As Marty and I discussed on the phone, there is some discrepancy on the polycarbonate tubes that I am investigated [sic]. Either ID/OD tolerances are not met from the supplier or the concentricity is not good enough to fit these delrin top and bottom cap grooves.
    Could you please quote me for turning down the ID of the reservoir piston and widening the grooves of the top and bottom caps of the 140 oz reservoir (qty 3 of each). Attached are the revised prints.
    If I decide to go this route[,] I will send you the parts back with one of the polycarbonate tubes to ensure fit.

DPM did not receive further communication from GGI and did not receive the parts back. In a March 28, 2017, letter to DPM, Ryan alleged that DPM had breached its contract with GGI. The message calculated total damages to GGI of $71,306.00, which included claims for Weber's and Ryan's wages while waiting for the parts, overhead, lost patent life, lost time to market, and "[a]dditional costs to get working parts." The damages calculation subtracted $21,567.78 for the "Decker Invoice" and listed a balance due to GGI of $49,738.22.

Negotiations over payment for the parts and GGI's alleged damages proceeded no further. Weber discarded all the relevant parts sometime in June or July 2017 when he moved into a new house. GGI never paid for the parts.

DPM filed a petition in November 2017 seeking damages for breach of contract and open account. GGI responded with a counterclaim for the damages Ryan had outlined in the March 28 letter. GGI also raised the affirmative defense that DPM was in breach of contract was therefore barred from bringing an action for damages. The matter was heard at a bench trial on January 22, 2019.

The district court found that DPM proved it performed on the contract and that GGI breached. The court entered judgment in favor of DPM in the amount of $19,798.11 on the breach-of-contract claim. GGI's counterclaim was denied and dismissed. GGI appealed the award to DPM.

**Standard of Review**

"When a district court's ruling is challenged for lack of substantial evidence, we view the evidence in the light most favorable to the judgment." *Frank Millard & Co. v. Housewright Lumber Co.*, 588 N.W.2d 440, 441 (Iowa 1999) (citing *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996)).

> The district court's findings of fact have the effect of a jury verdict and are binding on us if supported by substantial evidence. Evidence is substantial when a reasonable mind would accept it as adequate to reach the same findings. Evidence is not insubstantial merely because it would have supported contrary inferences.

*Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000) (citations omitted). "We will liberally construe the district court's findings to uphold, rather than defeat, the result reached." *Frank Millard*, 588 N.W.2d at 441.

**Discussion**

On appeal, GGI argues the trial court's decision is based on facts that are impossible and is therefore not supported by substantial evidence. GGI takes issue with the district court's findings, which gave weight to Decker's testimony despite the lack of fit between the parts that DPM machined and shipped to GGI.

## A. DPM's Missing Compliance Report

Under the umbrella of a substantial-evidence attack on the verdict, GGI makes two main arguments. First, GGI argues as follows:

> No reasonable person would believe that Decker performed tests on the parts in question that demonstrated that the parts were within the specifications called for by the contract, and that Decker had written final of these tests, when that written final was not provided by Decker to [GGI] in the Initial Disclosures or to the Court as an exhibit.

Preliminarily, we note that whether or not to apply an inference from missing evidence is a decision largely left to the discretion of the trial court. *State v. Langlet*, 283 N.W.2d 330, 335 (Iowa 1979). The trial court did credit Decker's testimony more than Weber's even though Weber's issues with the parts were documented in compliance reports, one of which was solely devoted to the polycarbonate tubing. However, the court found Decker to be a credible witness and was entitled to refrain from making a negative inference about the missing compliance report that Decker testified was created at DPM. The decision to credit Decker's testimony more than Weber's testimony and reports was only part of the basis for the trial court's finding that GGI's failure to pay constituted a breach of the contract. Decker's failure to produce written compliance reports at trial is therefore not fatal to its claim that GGI improperly failed to pay.

GGI based its refusal to pay in significant part on the timeliness issues it attributed to DPM. The trial court disagreed with that view, placing blame for timeliness issues on GGI. Indeed, while DPM was slow to begin machining parts, GGI compounded the problem by supplying designs that required clarifications and by choosing to have DPM ship the parts together instead of separately as they became available. Moreover, the parts were for a prototype. GGI's final purchase order issued on February 9, 2017, but DPM needed to send clarifying emails regarding design details on February 9, 10, 13, 15, 16, and 22, 2017. The shipments were received on February 22 and 27 of that year. The trial court found that shipment was delayed by the placement of the order on hold by GGI at one point, the need for clarifications, and the choice to ship parts together, a finding that is supported by substantial evidence.

Several other considerations shed light on the trial court's decision to credit Decker's testimony even in light of the missing compliance report. First, while Weber provided evidence as to flaws with a variety of parts, GGI's main complaint was with the polycarbonate tubing, and the district court found that GGI bore the burden of flaws inherent in the tubing it had supplied.[2] Given this finding that GGI bore the consequences of the tubing flaws, the finding that DPM performed on the

---

[2] We note that the polycarbonate tubing, responsibility for which was vigorously disputed at trial, represents just over one percent of the invoices at issue. On appeal, neither party raised the issue of whether DPM's work on the misshapen tubing constituted a material amount of DPM's work as a whole, and we question whether the degree to which these two part types fit together has been at times confused for the degree to which DPM performed on the contract. Because this issue is not properly presented, we will not consider it. *See State v. Stoen*, 596 N.W.2d 504, 507 (Iowa 1999) (declining to assume a partisan role and undertake research and advocacy on behalf of a party).

contract is supported by substantial evidence even though GGI presented evidence tending to show that irregularities in the tubing could be attributable to DPM.[3]

Second, Weber's compliance reports show that over a dozen parts were flawed in some respect, yet GGI provided no testimony as to how these other parts materially affected the performance or assembly of the prototype applicator. GGI points to the polycarbonate tubing as a pillar of DPM's breach, but having recognized that GGI chose the design and supplier of the tubing, much of the import of Weber's compliance reports is lost.

Third, the district court found that Weber was not an expert in the type of machining done at DPM and he therefore could not provide expert testimony regarding the effect such machining would have on the tubing. The court's finding regarding the scope of Weber's expertise undermines the credibility and evidentiary strength of his compliance reports.

Weber's testimony and compliance reports support the inference that DPM's shipments contained parts that did not meet the tolerances specified in GGI's designs. However, we will not find evidence insubstantial "merely because it would have supported contrary inferences." *Hendricks*, 609 N.W.2d at 490. The district court's choice to credit Decker's testimony came amidst showings that GGI shared responsibility for timeliness and part problems, and various aspects of the evidence supported DPM's credibility over GGI's. The court's credibility

---

[3] GGI's engineer testified that the tubing supplied for the prototypes was selected in an effort to keep the costs low, saying, "the higher degree of tolerance accuracy, the more expensive the part." He further acknowledged "mov[ing] away from polycarbonate for that exact factor, that the tolerances were very wide."

determination was not improper.[4]  We therefore reject GGI's first argument on appeal.  Because the polycarbonate tubing took on a central role at trial, we turn next to consider GGI's argument with respect to that material.

### B. Design Issues

GGI argues that the trial court's findings with regard to the polycarbonate tubing are inconsistent, impossible, and therefore not supported by substantial evidence.  It argued, "[N]o reasonable person could decide that the parts machined by [DPM] met the contractual specifications while at the same time deciding that those same parts could not meet the same contractual specifications because the material supplied was deficient."  The principal flaw with this argument is that it ignores evidence at trial showing the contractual specifications to be defective.

The tubing used for the reservoir piece was left over from an earlier job DPM had done for GGI in 2015.  Plans for this tubing from October 2016 indicate an inside diameter of 6.5 inches with an allowable tolerance, or acceptable deviation from specified measurement, of +/-.012 inches.  Plans for the piston indicated a maximum diameter of 6.49 inches with tolerances of +.000 inches or -.003 inches.  Thus, the plans contemplated that the inside diameter of the tubing might range from 6.488 inches to 6.512 inches, with the piston diameter ranging from 6.487 inches and 6.49 inches.  As DPM points out, even if DPM failed to check that the tubing was within the specified tolerances when it arrived from the supplier or if DPM damaged the tubing during machining such that it exceeded tolerances, the

---

[4] Ryan also testified, as the inventor of the prototype.  He did not testify to having examined the parts in question and was unaware of who purchased the tubing supplied to DPM.

tolerances listed in GGI's design would have led to a lack of fit if the parts were manufactured in accordance with specifications. To explain further, the tolerances might have led to an inside diameter measurement on the tubing of 6.488 inches while the piston measured between 6.489 and 6.490 inches. A lack of fit was thus inherent in GGI's design, since the piston's diameter was contemplated to be greater than the inside diameter of the tubing, even before O-rings were added to the piston.

The above argument suffers from the further flaw that it incorrectly attributes to the trial court a specific finding that the parts were within tolerances upon leaving DPM, which the trial court never explicitly found. Instead, the court acknowledged that Decker and Weber provided conflicting testimony regarding whether the parts left DPM within allowable tolerances. The court found that GGI bore the consequences of delivering unsuitable materials and that DPM "manufactured the parts at issue in the manner they were supposed to be manufactured," thereby performing its duties in accordance with the terms and conditions of the contract.

The court specifically highlighted Weber's February 24, 2017, email that conceded the problem with the tubing could be a supplier problem and indicated it would supply different tubing if necessary. Because the court found issues with the designs of multiple parts, it could have and did reasonably find that DPM performed on the contract even though the resultant parts were not appropriate for GGI's purposes. The court heard evidence that the tubing design was flawed, and it heard conflicting evidence as to whether the tubing was outside of tolerances specified in the design when it was shipped. The court's finding that DPM performed its obligations is not dissonant with its finding that the tubing was flawed

when shipped from DPM, particularly because the trial court found that the responsibility to supply proper tubing laid with GGI and that DPM's responsibilities with respect to the tubing were limited to cutting it to certain lengths and chamfering the inside diameter edge. Weber acknowledged one of the reasons that GGI selected this particular tubing was that such was available at low cost, stating "the higher degree of tolerance accuracy, the more expensive the part. And so polycarbonate was a way to keep the full assembly cheap." He further acknowledged, "We've since moved away from the polycarbonate for that exact factor, that the tolerances were very wide." The designs for subsequent prototypes were reworked in an effort to make a successful product. However, the final product has not yet been marketed. Simply put, GGI's selection of polycarbonate tubing with too much size variance for the DPM order caused the parts to fail.

**Conclusion**

We find the district court's findings to be supported by substantial evidence, and we disagree with GGI's characterization of the court's factual findings as impossible or irreconcilable. For the foregoing reasons, we affirm the judgment in favor of DPM.[5]

**AFFIRMED.**

---

[5] In its prayer for relief, GGI requests that we "reverse the finding of the district court and remand this case to the district court with instructions to make a determination as to the amount of [GGI's] damages or remand it with instructions to retry the entire case." We decline to grant the requested relief, as we find GGI's entitlement to relief under its counterclaim is unavailable due to our holding with respect to DPM's claim or is unavailable due to not being properly briefed. GGI counterclaimed for damages, alleging that DPM "breached their contract by delivering the parts late, and by delivering parts that did not conform to the contract." The district court rejected the counterclaim along with GGI's affirmative

defense. The merits regarding the latter portion of the counterclaim are addressed by the district court's finding that DPM performed its duties under the contract, a finding we have affirmed. Although GGI's notice of appeal indicated GGI was appealing "from all adverse rulings" in the district court's May 1, 2019 order, GGI has not addressed the counterclaim in its appellate briefing other than by contesting the district court's findings with respect to DPM's claim. Indeed, GGI concedes that "[t]he main issue in this appeal . . . [is] whether the parts machined by Decker met the specifications called for in the contract." To the extent GGI in its prayer for relief seeks to relitigate the portion of its counterclaim pertaining to whether DPM was tardy in delivering parts, it has failed to brief the issue. The alleged tardiness by which DPM delivered the parts is thus not a proper ground for reversal, as GGI has waived the argument. *See* Iowa R. App. P. 6.903(2)(g)(3). Because our holding with respect to DPM's claim is dispositive of the remainder of GGI's counterclaim, we decline to remand to the district court for a retrial or a determination of GGI's damages.