# IN THE COURT OF APPEALS OF IOWA

No. 23-1200
Filed July 3, 2024

## IN THE MATTER OF THE GUARDIANSHIP OF G.B.

**S.F.,**
Appellant.

_____

Appeal from the Iowa District Court for Harrison County, Charles D. Fagan,

Judge.


A guardian appeals the termination of a minor guardianship. **AFFIRMED.**


Michael J. Winter, Council Bluffs, for appellant.

J. Joseph Narmi, Council Bluffs, for appellee.


Considered by Badding, P.J., Langholz, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BADDING, Presiding Judge.**

A guardian appeals the termination of a guardianship for her granddaughter established through a child-in-need-of-assistance proceeding. Less than two years after the guardianship was established, the child's mother applied to terminate it. The juvenile court granted the mother's request, finding she was "capable of resuming the care of this child." The guardian appeals, claiming the "mother has an inability to achieve security and stability for the child" and her "immaturity and instability ha[ve] barely improved since the establishment of the guardianship." We affirm upon our de novo review of the record.

## I.       Background Facts and Proceedings

This case involves a guardianship for G.B., a minor child born in 2016. Sara is G.B.'s mother, and Susan is G.B.'s maternal grandmother. Susan was appointed as G.B.'s guardian in May 2021 at the end of a child-in-need-of-assistance proceeding. *See* Iowa Code § 232D.201(2) (2021). Letters of appointment issued in July. *See id.* § 232D.403. In January 2023, Sara sought to terminate the guardianship, claiming it was no longer necessary because she was sober and "able to meet all of her child's physical and emotional needs." In her answer, Susan objected to termination.

Prior to the hearing on Sara's application, the appointed court visitor issued a report detailing her investigation and recommendation. *See id.* § 232D.305. The court visitor interviewed G.B., Susan, and Sara. She also interviewed G.B.'s kindergarten teacher and Sara's fiancé, John. Her investigation disclosed that G.B. is the youngest of Sara's five children. Sara's parental rights to the other children were terminated due to her "usage of illegal substances and alcohol."

Susan adopted those children in 2016. During those proceedings, Sara gave birth to G.B. while she was at an inpatient treatment facility. After Sara graduated from the facility, she and G.B. lived with Susan off and on until G.B. was eighteen months old. Sara then tested positive for methamphetamine while on probation, and Susan started caring for G.B. full time. Since G.B. has been in Susan's care, there have been no concerns for her well-being—she is healthy, on track academically, and close with her four half-siblings.

The child-in-need-of-assistance proceeding for G.B. was not filed until March 2021, after she had been in Susan's care for several years. Susan testified that she contacted the Iowa Department of Health and Human Services because Sara was texting her "like, at midnight, one o'clock in the morning, 'I'm going to come get'" the child. The case was quickly resolved with the juvenile court's order in May, establishing the guardianship for the child under chapter 232D and "closing the child in need of assistance case." From there, Susan allowed Sara to have regular contact with G.B., with visits on holidays, birthdays, and during the summer, plus weekly phone calls. Sara pays child support to Susan and has taken G.B. back-to-school shopping. She also gets G.B. gifts—sometimes going overboard, according to Susan. All the children, G.B. included, call Sara "mom" and Susan "grandma."

The court visitor's report noted that Sara lives in Iowa in a farmhouse she and John rent from his parents. Sara was open with the visitor about her criminal history, which includes convictions for child endangerment, third-degree burglary, second-degree theft, unauthorized use of a credit card, operating while intoxicated, disorderly conduct, assault, and fifth-degree criminal mischief. The last four

convictions were from 2020 and 2021, but Sara has been off probation since October 2022. Sara was also open about her history of alcohol and drug use, including methamphetamine and marijuana. She told the visitor her sobriety date was April 1, 2021. After twice attending inpatient treatment, Sara "credited her relationship with John as the driving force of sobriety." The visitor noted, however, that Susan "believes Sara still drinks alcohol." Like Sara, John also has a substantial criminal and substance-use history. He described himself in court as a former "drug addict and thief. I stole to support my habit." John got sober in prison, putting his sobriety date at March 9, 2013. He had been out of prison for three years when he was interviewed by the court visitor, successfully discharging his parole in July 2022.

Based on her investigation, the court visitor observed that Sara had "demonstrated changes in her life by maintaining appropriate employment and a stable, safe home." Yet she shared Susan's concerns that Sara's stability was short-lived when compared to her "years of substance abuse, criminal charges, and unsafe living environments." And the visitor was concerned about the lack of significant time that Sara had spent with G.B. outside of Susan's home and with separating G.B. from her siblings. Susan was worried about the same thing, telling the court visitor that G.B. "has lived with her siblings for as long as she can remember." In the end though, the visitor recommended terminating the guardianship with certain transition and safety conditions.

Following the court visitor's report, the juvenile court entered an order in March 2023 that imposed the recommended conditions, pending a hearing on Sara's application in July. Those conditions included that (1) G.B. be allowed to

finish the school year at her current school; (2) Sara continue to have regular visitation with G.B.; (3) Sara have overnight visits and "a longer visitation at her home after school ends for the year"; (4) Sara and John complete regular drug testing, and (5) Susan and Sara come up with a plan to maintain G.B.'s sibling relationships.

The hearing on the petition was held as scheduled in July. By then, Sara and John had lived together in his parents' farmhouse for more than two years. Both their names were on the lease, and they had a room ready for G.B. They had complied with drug testing in the months before the hearing, and consistently tested negative.[1] When asked what changes she had made since the guardianship was established, Sara testified: "I have embraced sobriety. I started going to church, I've done volunteer work, and I have had long-term employment. . . . I have a stable home." In anticipation of G.B. coming to live with her, Sara changed jobs to work only weekends so she could be home with G.B. during the week. But despite the court's earlier order, Sara testified that she hadn't had a visit since April when G.B. came to stay with them in Iowa for the weekend. She repeatedly texted Susan to arrange another visit, but Susan didn't respond. Sara was able to continue regular phone calls with G.B. though.

Like she did in her interview with the court visitor, Sara was up front with the juvenile court about her "bad past" involving criminal activity, drug use, and alcoholism, but she maintained that she has been sober since 2021. John testified

---

[1] They submitted to drug tests on March 17 (urine and hair) and 31 (urine); April 14 (sweat and urine); May 5 (urine) and 18 (urine); and June 5 (urine), 8 (sweat), and 28 (hair).

that he understood Susan's doubts about them: "As drug addicts, we hurt people, and we hurt people bad. . . ." But he said Sara was "confused," telling him several times that she "doesn't understand why she feels like her mom's the only person that doesn't want [her] to get her life together and have" G.B. back. Sara testified that she loved her mother, was grateful for all she had done, and did not have any "ill will towards" her. If the guardianship was terminated, Sara was committed to maintaining a relationship between G.B., her siblings, and Susan.

Susan, however, was "greatly opposed" to G.B. living with Sara. She testified the "biggest reason" was that G.B. was "stable. She enjoys her school. She has friends. . . . She's known no other home." Susan added that G.B. is "really tight" with her siblings[2] and "knows no other situation." When asked how G.B. would be affected if the guardianship were to terminate, Susan testified: "I personally don't think it would be good."

Susan generally implied in her testimony that Sara is still unstable and not sober. She testified about a visit between Sara and the children at a beach in either July 2021 or 2022 when "Sara was wasted out on the raft, blaring music on her phone, drunk as a skunk," and not watching the kids in the water. And she accused Sara of smoking marijuana in Susan's van in early 2022, although on cross-examination, Susan admitted that she doesn't know what marijuana smells like. There was also a birthday party for two of the children in September when

---

[2] The oldest child, age fifteen, had recently been placed in foster care. Susan testified this resulted from that child "acting out," not following rules, being mean to her siblings, and vaping. Susan explained the child "got out of control, and I couldn't handle it." Sara was in the process of "filing the paperwork to have an interstate compact" that would allow that child to live with her in Iowa.

Susan claimed Sara was drinking. And in December, Susan testified that Sara came to Missouri for one of the other children's school programs but did not see G.B. Sara explained that she didn't see G.B. or the other children then because Susan told her she couldn't. Susan denied that, though she generally agreed that she restricted Sara's in-person contact with G.B. during the proceedings. Susan testified she did so after the visit in April because G.B. told her that Sara wouldn't let her call Susan. She also accused Sara of letting G.B. sleep in a bed with John only. Both Sara and John denied these accusations.

At the end of the hearing, the juvenile court observed from the bench that Sara had gotten her act together and

> [t]he reality is if a parent does the things we ask them to do and shows us that they're clean, sober, employed, and are capable of housing and caring for the child, that allows for this Court to dissolve the guardianship and allow the child to be returned to their parent.

Because Sara had done those things, the court entered a written ruling terminating the guardianship with a transition plan to get G.B. used to living with Sara before the upcoming school year. Susan appeals.

## II. Standard of Review

"An action to terminate a guardianship is equitable in nature, so our review is de novo." *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022). "We give weight to the juvenile court's factual findings, but we are not bound by them." *Id.*

### III.    Analysis

### A.    Termination Standard

Iowa Code section 232D.503 sets out two tracks for terminating a guardianship—one to be used when the guardianship was established *with* parental consent under section 232D.203 and one to be used when the guardianship was established *without* parental consent under section 232D.204. *See In re Guardianship of E.B.*, No. 23-0486, 2023 WL 6620521, at *5 (Iowa Ct. App. Oct. 11, 2023), *further review denied* (Dec. 8, 2023) ("The requirements for terminating a guardianship of a minor depend on the type of guardianship established."). The guardianship here, however, was not established under either of those code sections. It was instead established under section 232D.201(2), which provides that the "court may appoint a guardian for a minor in a child in need of assistance case pursuant to section 232.101A, 232.103A, or 232.104." Those provisions may or may not involve parental consent. And section 232D.503 is silent as to which standard should be applied to guardianships entered under section 232D.201(2). So we are left with determining whether this guardianship was established with or without parental consent.

The order establishing the guardianship, which referred to both a dispositional and permanency order, did not indicate whether it was being entered under section 232.101A or 232.104.[3] Nor did it indicate whether Sara consented to the guardianship. The record contains no pleadings from the child-in-need-of-

---

[3] Section 232.103A allows for bridge orders when the "child is safely placed with a parent," which was not the case here. Section 232.101A can be used after a dispositional hearing, while section 232.104 applies after a permanency hearing.

assistance case, and the parties did not discuss the standard to be used at the hearing on Sara's application to terminate the guardianship. To add to the confusion, Susan's appellate brief cites the standard to be applied when a guardianship is established with parental consent, while the court visitor's report cited the standard to be applied when a guardianship is established without parental consent. Sara cites neither standard on appeal, instead relying on the constitutionally based parental preference. And it is unclear from the juvenile court's ruling which standard it applied.

The standard matters because the burdens of proof are different. *See L.Y.*, 968 N.W.2d at 898–900 (discussing the different burdens under sections 232D.503(2) and (3)). Under section 232D.503(2), to terminate a guardianship established with parental consent, "courts must start with the rebuttable presumption that the child's best interests are served in the parent's custody as opposed to all others." *Id.* at 898. In that scenario, "the guardian must prove by clear and convincing evidence that (1) termination of the guardianship would be harmful to the minor; and (2) the minor's interest in continuation of the guardianship outweighs the interest of a parent in the termination of the guardianship." *Id.* at 900. But to terminate a guardianship established without parental consent, the burden is initially on the moving party under section 232D.503(3): "A person seeking termination of guardianship established pursuant to section 232D.204 has the burden of making a prima facie showing that the guardianship should be terminated." If that showing is made, then the "guardian has the burden of going forward to prove by clear and convincing

evidence that the guardianship should not be terminated." Iowa Code § 232D.503(3).

We find the correct standard here is the one set out in section 232D.503(3) for guardianships established without parental consent. We reach this conclusion because the record does not show Sara ever signed an affidavit of consent or a guardianship agreement as required for a guardianship established with parental consent, or otherwise consented to the guardianship. *See* Iowa Code § 232D.203(2), (3); *see also E.B.*, 2023 WL 6620521, at \*4 (considering guardianship as one established without parental consent because "the order does not make the necessary findings to establish a guardianship with consent under section 232D.203"). Even though the juvenile court did not expressly apply this standard in deciding to terminate the guardianship, we may do so on our de novo review of the record. *See L.Y.*, 968 N.W.2d at 901 ("Because we are vested with de novo review authority and the record before us is complete, remand is not necessary in this case.").

### B. Discussion

Section 232D.503(3) requires the court to terminate a guardianship established under section 232D.204 without parental consent "if the court finds that the basis for the guardianship set forth in section 232D.204 is not currently satisfied." Iowa Code § 232D.503(3). As discussed above, the person seeking termination must make "a prima facie showing that the guardianship should be terminated." *Id.* "If that showing is made, the guardian must put forth clear and convincing evidence showing the guardianship should not be terminated." *E.B.*, 2023 WL 6620521, at \*5.

Susan does not claim that Sara failed to make this prima facie showing.  So the question is whether she overcame the conclusion that the guardianship should be terminated.  Without identifying what the ongoing basis for a guardianship without consent would be under section 232D.204,[4] Susan asks the court to "note the following" circumstances in considering whether the guardianship should be terminated.

First, Susan contends Sara "has had little involvement with the nitty gritty of caring for" G.B., as shown by Sara's rare attendance at school conferences and lack of "evidence that she attends doctor appointments or dentist appointments."  But Sara told the court visitor that she "receives no information regarding [G.B.'s] schooling or medical appointments."  Susan did not present any evidence to counter that assertion, and it was her burden to do so.  In addition, Susan responded to Sara's efforts to become more involved in G.B.'s life by unilaterally denying visitation in violation of a court order.  These circumstances do not support an ongoing basis for the guardianship.

Second, Susan argues she refuted Sara's claim that she no longer consumes alcohol based on her testimony about times when she saw Sara intoxicated.  She relatedly asserts that Sara and John have a long substance-use history and their sobriety and stability are short-lived.  In commending Sara for her

---

[4] There are two "alternative methods of proving the need for establishment of a guardianship" under section 232D.204.  *In re Guardianship of J.M.*, 2021 WL 4304224, at *5 (Iowa Ct. App. Sept. 22, 2021).  The first involves a de facto guardian and a parent with legal custody who has "a demonstrated lack of consistent participation in the minor's life."  Iowa Code § 232D.204(1)(a), (b).  The second applies when "[n]o parent having legal custody of the minor is willing or able to exercise the power the court will grant to the guardian" and appointment of a guardian "is in the best interest of the minor."  *Id.* § 232D.204(2)(a), (b).

progress and ultimately terminating the guardianship, the juvenile court implicitly found Sara more credible on each of these points. We defer to that implicit credibility finding.[5] *See* Iowa R. App. P. 6.904(3)(g); *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) (noting issues of credibility "are best resolved by the district court" and will not be reevaluated on appeal); *Davis v. Gordon Food Serv., Inc.*, No. 22-1944, 2024 WL 702395, at *4 (Iowa Ct. App. Feb. 21, 2024) ("This is a credibility finding, implicit or otherwise, and we defer to it."). And we find it is supported by the record, which included multiple negative drug tests. In discussing those tests, the court told Susan that this was "the most drug testing I've requested of anyone in the time frame I've requested it, and they passed every single test. So your basis or your hunch that [Sara's] not sober just does not jive with the evidence."

Third, Susan asserts "[t]he only home that the child has enjoyed since she was 18 months old to her current age of six has been" her home, which is close to the school that G.B. and her siblings attend. The presence of a de facto guardianship coupled with "a demonstrated lack of consistent parental participation in the life of the minor" can be the basis for establishing and continuing

---

[5] Susan also argues "Sara has allowed the child to share a bed with John . . . in Sara's absence," though Susan testified that she was not "accusing John or anybody of anything." Sara and John denied that happened, and the juvenile court rejected Susan's claim: "Having suspicion that they're doing something isn't the same as proof that they did something. Having a disagreement as to how the visit went doesn't allow you to stop the visits in their entirety." *Cf. E.B.*, 2023 WL 6620521, at *6 (noting the evidence presented "only a theoretical danger" to the child, which did not satisfy the guardians' burden of proving the guardianship should not be terminated). We again defer to that credibility finding.

a guardianship. *See* Iowa Code § 232D.204(1). Section 232D.102(4) defines "[d]emonstrated lack of consistent parental participation" to mean

> the refusal of a parent to comply with duties and responsibilities imposed upon a parent by the parent-child relationship, including but not limited to providing the minor with necessary food, clothing, shelter, health care, education, and other care and supervision necessary for the minor's physical, mental, and emotional health and development.

In assessing a parent's lack of participation, the court looks to the intent of the parent in allowing a de facto guardianship, amount of communication and visitation during the de facto guardianship, and the parent's refusal to comply with conditions for retaining custody set forth in any previous court orders. *Id.* § 232D.204(1)(b).

On the first factor, we surmise from the record that Sara allowed the guardianship to continue until she started to get her life together. *See In re Guardianship of Ashleigh R.*, 55 P.3d 984, 992 (N.M. Ct. App. 2002) ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs."). That is what our guardianship act envisions should happen. *See L.Y.*, 968 N.W.2d at 900 ("[G]uardianships are designed to temporarily relieve parents of the rigors of raising a child." (citation omitted)). As to contact and visitation, it is undisputed that Sara continued to have both with G.B., at least until this proceeding started. And she paid Susan child support; took G.B. back-to-school shopping; and gave her clothes, shoes, and other presents. On the last factor, Susan presented no evidence about conditions in previous court orders or Sara's refusal to comply with those conditions, other than that the child-in-need-of-assistance case ended with the establishment of a guardianship. We

accordingly find that G.B.'s residence with Susan is not clear and convincing evidence that one of the bases for continuing the guardianship is satisfied. *See L.Y.*, 968 N.W.2d at 895–96 ("It is not unusual for Iowa's court to remove children from conscientious, well-intentioned custodians with a history of providing good care to the children and place them with a natural parent." (cleaned up)).

Fourth, Susan points to G.B.'s relationships with her siblings, which she argues should not be severed. Sara unequivocally testified she intended to continue G.B.'s relationships with her siblings—who were also Sara's children—and Susan presented no evidence to dispute that intent. To the extent that Susan's concern is the trauma that might be caused by separating the siblings, "[n]o matter how cases like this one are resolved, there will likely be anxiety and stress for the child for a period of time." *Id.* at 901. "In these situations the love of the temporary custodians for the children should be directed toward minimizing the trauma of dislocation rather than used as a premise for acrimonious custody litigation." *In re Burney*, 259 N.W.2d 322, 325 (Iowa 1977). All that said, we emphasize the juvenile court's hope "that Susan and Sara [will] work together to allow [G.B.] and her siblings to still see each other and bond with each other as much as possible."

In the end, we agree with the juvenile court that "Mom has done what we've asked. If she relapses, if she has issues, those—that's going to show up pretty quickly in a small town . . . but the reality is, the guardianship served its purpose." Because of that success, we find the juvenile court correctly terminated the guardianship. *See L.Y.*, 968 N.W.2d at 903 ("[T]he guardianship was successful because it allowed Mom to seek help in caring for L.Y. when she needed it from

loving grandparents who were temporarily able to provide that care until Mom was once again able to parent L.Y. full time.").

**AFFIRMED.**